Justice Souter
delivered the opinion of the Court.
Officials of the Bureau of Land Management stand accused of harassment and intimidation aimed at extracting an easement across private property. The questions here are whether the landowner has either a private action for damages of the sort recognized in Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971), or a claim against the officials in their individual capacities under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. §§ 1961-1968 (2000 ed. and Supp. IV). We hold that neither action is available.
I
A
Plaintiff-respondent Frank Robbins owns and operates the High Island Ranch, a commercial guest resort in Hot Springs County, Wyoming, stretching across some 40 miles of territory. The ranch is a patchwork of mostly contiguous land *542 parcels intermingled with tracts belonging to other private owners, the State of Wyoming, and the National Government. Its natural resources include wildlife and mineral deposits, and its mountainous western portion, called the upper Rock Creek area, is a place of great natural beauty. In response to persistent requests by environmentalists and outdoor enthusiasts, the Bureau tried to induce the ranch’s previous owner, George Nelson, to grant an easement for publie use over South Fork Owl Creek Road, which runs through the ranch and serves as a main route to the upper Rock Creek area. For a while, Nelson refused from fear that the public would disrupt his guests’ activities, but shortly after agreeing to sell the property to Robbins, in March 1994, Nelson signed a nonexclusive deed of easement giving the United States the right to use and maintain the road along a stretch of his property. In return, the Bureau agreed to rent Nelson a right-of-way to maintain a different section of the road as it runs across federal property and connects otherwise isolated parts of Robbins’s holdings.
In May 1994, Nelson conveyed the ranch to Robbins, who continued to graze cattle and run guest cattle drives in reliance on grazing permits and a Special Recreation Use Permit (SRUP) issued by the Bureau. But Robbins knew nothing about Nelson’s grant of the easement across South Fork Owl Creek Road, which the Bureau had failed to record, and upon recording his warranty deed in Hot Springs County, Robbins took title to the ranch free of the easement, by operation of Wyoming law. See Wyo. Stat. Ann. -§34-1-120 (2005).
When the Bureau’s employee Joseph Vessels[1] discovered, in June 1994, that the Bureau’s inaction had cost it the easement, he telephoned Robbins and demanded an easement to replace Nelson’s. Robbins refused but indicated he would *543 consider granting one in return for something. In a later meeting, Vessels allegedly told Robbins that “‘the Federal Government does not negotiate,’” and talks broke down. Brief for Respondent 5. Robbins says that over the next several years the defendant-petitioners (hereinafter defendants), who are current and former employees of the Bureau, carried on a campaign of harassment and intimidation aimed at forcing him to regrant the lost easement.
B
Robbins concedes that any single one of the offensive and sometimes illegal actions by the Bureau’s officials might have been brushed aside as a small imposition, but says that in the aggregate the campaign against him amounted to coercion to extract the easement and should be redressed collectively. The substance of Robbins’s claim, and the degree to which existing remedies available to him were adequate, can be understood and assessed only by getting down to the details, which add up to a long recitation.[2]
In the summer of 1994, after the fruitless telephone conversation in June, Vessels wrote to Robbins for permission to survey his land in the area of the desired easement. Robbins said no, that it would be a waste of time for the Bureau to do a survey without first reaching agreement with him. Vessels went ahead with a survey anyway, trespassed on Robbins’s land, and later boasted about it to Robbins. Not surprisingly, given the lack of damage to his property, Robbins did not file a trespass complaint in response.
Mutual animosity grew, however, and one Bureau employee, Edward Parodi, was told by his superiors to “look closer” and “investigate harder” for possible trespasses and other permit violations by Robbins. App. 128-129. Parodi *544 also heard colleagues make certain disparaging remarks about Robbins, such as referring to him as “the rich SOB from Alabama [who] got [the Ranch].” Id., at 121. Parodi became convinced that the Bureau had mistreated Robbins and described its conduct as “the volcanic point” in his decision to retire. Id., at 133.
Vessels and his supervisor, defendant Charles Wilkie, continued to demand the easement, under threat to cancel the reciprocal maintenance right-of-way that Nelson had negotiated. When Robbins would not budge, the Bureau canceled the right-of-way, citing Robbins’s refusal to grant the desired easement and failure even to pay the rental fee. Robbins did not appeal the cancellation to the Interior Board of Land Appeals (IBLA) or seek judicial review under the Administrative Procedure Act (APA), 5 U. S. C. § 702.
In August 1995, Robbins brought his cattle to a water source on property belonging to his neighbor, LaVonne Pennoyer. An altercation ensued, and Pennoyer struck Robbins with her truck while he was riding a horse. PlaintiffAppellee’s Supp. App. in No. 04-8016 (CA10), pp. 676-681 (hereinafter CA10 App.); 9 Record, PI. Exh. 2, pp. 164-166; 10 id., PI. Exh. 35a, at 102-108. Defendant Gene Leone fielded a call from Pennoyer regarding the incident, encouraged her to contact the sheriff, and himself placed calls to the sheriff suggesting that Robbins be charged with trespass. After the incident, Parodi claims that Leone told him: “ ‘I think I finally got a way to get [Robbins’s] permits and get him out of business.’” App. 125,126.
In October 1995, the Bureau claimed various permit violations and changed the High Island Ranch’s 5-year SRUP to a SRUP subject to annual renewal. According to Robbins, losing the 5-year SRUP disrupted his guest ranching business, owing to the resulting uncertainty about permission to conduct cattle drives. Robbins declined to seek administrative review, however, in part because Bureau officials told *545 him that the process would be lengthy and that his permit would be suspended until the IBLA reached a decision.[3]
Beginning in 1996, defendants brought administrative charges against Robbins for trespass and other land-use violations. Robbins claimed some charges were false, and others unfairly selective enforcement, and he took all of them to be an effort to retaliate for refusing the Bureau’s continuing demands for the easement. He contested a number of these charges, but not all of them, administratively.
In the spring of 1997, the South Fork Owl Greek Road, the only way to reach the portions of the ranch in the Rock Creek area, became impassable. When the Bureau refused to repair the section of road across federal land, Robbins took matters into his own hands and fixed the public road himself, even though the Bureau had refused permission. The Bureau fined Robbins for trespass, but offered to settle the charge and entertain an application to renew the old maintenance right-of-way. Instead, Robbins appealed to the IBLA, which found that Robbins had admitted the unauthorized repairs when he sent the Bureau a bill for reimbursement. The Board upheld the fine, In re Robbins, 146 I. B. L. A. 213 (1998), and rejected Robbins’s claim that the Bureau was trying to “ ‘blackmail’ ” him into providing the easement; it said that “[t]he record effectively shows ... intransigence was the tactic of Robbins, not [the] BLM.” Id., at 219. Robbins did not seek judicial review of the IBLA’s decision.
In July 1997, defendant Teryl Shryack and a colleague entered Robbins’s property, claiming the terms of a fence easement as authority. Robbins accused Shryack of unlawful *546 entry, tore up the written instrument, and ordered her off his property. Later that month, after a meeting about trespass issues with Bureau officials, Michael Miller, a Bureau law enforcement officer, questioned Robbins without advance notice and without counsel about the incident with Shryack. The upshot was a charge with two counts of knowingly and forcibly impeding and interfering with a federal employee, in violation of 18 U. S. C. § 111 (2000 ed. and Supp. IV), a crime with a penalty of up to one year in prison. A jury acquitted Robbins in December, after deliberating less than 30 minutes. United States v. Robbins, 179 F. 3d 1268, 1269 (CA10 1999). According to a news story, the jurors “were appalled at the actions of the government” and one said that “Robbins could not have been railroaded any worse ... if he worked for the Union Pacific.” CA10 App. 852. Robbins then moved for attorney’s fees under the Hyde Amendment, § 617, 111 Stat. 2519, note following 18 U. S. C. §3006A, arguing that the position of the United States was vexatious, frivolous, or in bad faith. The trial judge denied the motion, and Robbins appealed too late. See 179 F. 3d, at 1269-1270.
In 1998, Robbins brought the lawsuit now before us, though there was further vexation to come. In June 1999, the Bureau denied Robbins’s application to renew his annual SRUP, based on an accumulation of land-use penalties levied against him. Robbins appealed, the IBLA affirmed, In re Robbins, 154 I. B. L. A. 93 (2000), and Robbins did not seek judicial review. Then, in August, the Bureau revoked the grazing permit for High Island Ranch, claiming that Robbins had violated its terms when he kept Bureau officials from passing over his property to reach public lands. Robbins appealed to the IBLA, which stayed the revocation pending resolution of the appeal. Order in Robbins v. Bureau of Land Management, IBLA 2000-12 (Nov. 10, 1999), CA10 App. 1020.
The stay held for several years, despite periodic friction. Without a SRUP, Robbins was forced to redirect his guest *547 cattle drives away from federal land and through a mountain pass with unmarked property boundaries. In August 2000, Vessels and defendants Darrell Barnes and Miller tried to catch Robbins trespassing in driving cattle over a corner of land administered by the Bureau. From a nearby hilltop, they videotaped ranch guests during the drive, even while the guests sought privacy to relieve themselves. That afternoon, Robbins alleges, Barnes and Miller broke into his guest lodge, left trash inside, and departed without closing the lodge gates.
The next summer, defendant David Wallace spoke with Preston Smith, an employee of the Bureau of Indian Affairs who manages lands along the High Island Ranch’s southern border, and pressured him to impound Robbins’s cattle. Smith told Robbins, but did nothing more.
Finally, in January 2003, tension actually cooled to the point that Robbins and the Bureau entered into a settlement agreement that, among other things, established a procedure for informal resolution of future grazing disputes and stayed 16 pending administrative appeals with a view to their ultimate dismissal, provided that Robbins did not violate certain Bureau regulations for a 2-year period. The settlement came apart, however, in January 2004, when the Bureau began formal trespass proceedings against Robbins and unilaterally voided the settlement agreement. Robbins tried to enforce the agreement in federal court, but a District Court denied relief in a decision affirmed by the Court of Appeals in February 2006. Robbins v. Bureau of Land Management, 438 F. 3d 1074 (CA10).
C
In this lawsuit (brought, as we said, in 1998), Robbins asks for compensatory and punitive damages as well as declaratory and injunctive relief. Although he originally included the United States as a defendant, he voluntarily dismissed the Government, and pressed forward with a RICO claim *548 charging defendants with repeatedly trying to extort an easement from him, as well as a similarly grounded Bivens claim that defendants violated his Fourth and Fifth Amendment rights. Defendants filed a motion to dismiss on qualified immunity and failure to state a claim, which the District Court granted, holding that Robbins inadequately pleaded damages under RICO and that the APA and the Federal Tort Claims Act (FTCA), 28 U. S. C. § 1846, were effective alternative remedies that precluded Bivens relief. The Court of Appeals for the Tenth Circuit reversed on both grounds, 300 F. 3d 1208, 1211 (2002), although it specified that Bivens relief was available only for those “constitutional violations committed by individual federal employees unrelated to final agency action,” 300 F. 3d, at 1212.
On remand, defendants again moved to dismiss on qualified immunity. As to the RICO claim, the District Court denied the motion; as to Bivens, it dismissed what Robbins called the Fourth Amendment claim for malicious prosecution and those under the Fifth Amendment for due process violations, but it declined to dismiss the Fifth Amendment claim of retaliation for the exercise of Robbins’s right to exclude the Government from his property and to refuse any grant of a property interest without compensation. After limited discovery, defendants again moved for summary judgment on qualified immunity. The District Court adhered to its earlier denial.
This time, the Court of Appeals affirmed, after dealing with collateral order jurisdiction to consider an interlocutory appeal of the denial of qualified immunity, 433 F. 3d 755, 761 (2006) (citing Mitchell v. Forsyth, 472 U. S. 511, 530 (1985)). It held that Robbins had a clearly established right to be free from retaliation for exercising his Fifth Amendment right to exclude the Government from his private property, 433 F. 3d, at 765-767, and it explained that Robbins could go forward with the RICO claim because Government employees who *549 “engag[e] in lawful actions with an intent to extort a right-of-way from [a landowner] rather than with an intent to merely carry out their regulatory duties” commit extortion under Wyoming law and within the meaning of the Hobbs Act, 18 U. S. C. § 1951, 433 F. 3d, at 768. The Court of Appeals rejected the defense based on a claim of the Government’s legal entitlement to demand the disputed easement: “if an official obtains property that he has lawful authority to obtain, but does so in a wrongful manner, his conduct constitutes extortion under the Hobbs Act.” Id., at 769. Finally, the Court of Appeals said again that “Robbins’[s] allegations involving individual action unrelated to final agency action are permitted under Bivens.” Id., at 772. The appeals court declined defendants’ request “to determine which allegations remain and which are precluded,” however, because defendants had not asked the District Court to sort them out. Ibid.
We granted certiorari, 549 U. S. 1075 (2006), and now reverse.
II
The first question is whether to devise a new Bivens damages action for retaliating against the exercise of ownership rights, in addition to the discrete administrative and judicial remedies available to a landowner like Robbins in dealing with the Government’s employees.[4] Bivens, 403 U. S. 388, held that the victim of a Fourth Amendment violation by federal officers had a claim for damages, and in the years following we have recognized two more nonstatutory damages remedies, the first for employment discrimination in vi *550 olation of the Due Process Clause, Davis v. Passman, 442 U. S. 228 (1979), and the second for an Eighth Amendment violation by prison officials, Carlson v. Green, 446 U. S. 14 (1980). But we have also held that any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a Bivens remedy unjustified. We have accordingly held against applying the Bivens model to claims of First Amendment violations by federal employers, Bush v. Lucas, 462 U. S. 367 (1983), harm to military personnel through activity incident to service, United States v. Stanley, 483 U. S. 669 (1987); Chappell v. Wallace, 462 U. S. 296 (1983), and wrongful denials of Social Security disability benefits, Schweiker v. Chilicky, 487 U. S. 412 (1988). We have seen no case for extending Bivens to claims against federal agencies, FDIC v. Meyer, 510 U. S. 471 (1994), or against private prisons, Correctional Services Corp. v. Malesko, 534 U. S. 61 (2001).
Whatever the ultimate conclusion, however, our consideration of a Bivens request follows a familiar sequence, and on the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a Bivens remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. Bush, supra, at 378. But even in the absence of an alternative, a Bivens remedy is a subject of judgment: “the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.” Bush, supra, at 378.
*551 A
In this factually plentiful case, assessing the significance of any alternative remedies at step one has to begin by categorizing the difficulties Robbins experienced in dealing with the Bureau. We think they can be separated into four main groups: torts or tort-like injuries inflicted on him, charges brought against him, unfavorable agency actions, and offensive behavior by Bureau employees falling outside those three categories.
Tortious harm inflicted on him includes Vessels’s unauthorized survey of the terrain of the desired easement and the illegal entry into the lodge, and in each instance, Robbins had a civil remedy in damages for trespass. Understandably, he brought no such action after learning about the survey, which was doubtless annoying but not physically damaging. For the incident at the lodge, he chose not to pursue a tort remedy, though there is no question that one was available to him if he could prove his allegations. Cf. Correctional Services Corp., supra, at 72-73 (considering availability of state tort remedies in refusing to recognize a Bivens remedy).
The charges brought against Robbins include a series of administrative claims for trespass and other land-use violations, a fine for the unauthorized road repair in 1997, and the two criminal charges that same year. Robbins had the opportunity to contest all of the administrative charges; he did fight some (but not all) of the various land-use and trespass citations, and he challenged the road repair fine as far as the IBLA, though he did not take advantage of judicial review when he lost in that tribunal.[5] **8 He exercised his *552 right to jury trial on the criminal complaints, and although the rapid acquittal tended to support his charge of baseless action by the prosecution (egged on by Bureau employees), the federal judge who presided at the trial did not think the Government’s case thin enough to justify awarding attorney’s fees, and Robbins’s appeal from that decision was late. See Robbins, 179 F. 3d, at 1269-1270. The trial judge’s denial of fees may reflect facts that dissuaded Robbins from bringing a state-law action for malicious prosecution, though it is also possible that a remedy would have been unavailable against federal officials, see Blake v. Rupe, 651 P. 2d 1096, 1107 (Wyo. 1982) (“Malicious prosecution is not an action available against a law enforcement official”).[6] ****6 For each charge, in any event, Robbins had some procedure to defend and make good on his position. He took advantage of some opportunities, and let others pass; although he had mixed success, he had the means to be heard.
The more conventional agency action included the 1995 cancellation of the right-of-way in Robbins’s favor (originally given in return for the unrecorded easement for the Government’s benefit); the 1995 decision to reduce the SRUP from five years to one; the termination of the SRUP in 1999; and the revocation of the grazing permit that same year. Each time, the Bureau claimed that Robbins was at fault, and for each claim, administrative review was available, subject to ultimate judicial review under the APA. Robbins took no *553 appeal from the 1995 decisions, stopped after losing an IBLA appeal of the SRUP denial, and obtained a stay from the IBLA of the Bureau’s revocation of the grazing permit.
Three events elude classification. The 1995 incident in which Robbins’s horse was struck primarily involved Robbins and his neighbor, not the Bureau, and the sheriff never brought criminal charges. The videotaping of ranch guests during the 2000 drive, while no doubt thoroughly irritating and bad for business, may not have been unlawful, depending, among other things, upon the location on public or private land of the people photographed. C£ Restatement (Second) of Torts §652B (1976) (defining tort of intrusion upon seclusion).[7] Even if a tort was committed, it is unclear whether Robbins, rather than his guests, would be the proper plaintiff, or whether the tort should be chargeable against the Government (as distinct from employees) under the FTCA, cf. Carlson, 446 U. S., at 19-20 (holding that FTCA and Bivens remedies were “parallel, complementary causes of action” and that the availability of the former did not preempt the latter). The significance of Wallace’s 2001 attempt to pressure Smith into impounding Robbins’s cattle is likewise up in the air. The legitimacy of any impoundment that might have occurred would presumably have depended on where particular cattle were on the patchwork of private and public lands, and in any event, Smith never impounded any.
In sum, Robbins has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints. He suffered no charges of wrongdoing on his own part without an opportunity to defend himself (and, in the ease of the criminal charges, to recoup the consequent expense, though a judge found his claim wanting). And final agency action, as in canceling permits, for example, was open *554 to administrative and judicial review, as the Court of Appeals realized, 433 F. 3d, at 772.
This state of the law gives Robbins no intuitively meritorious case for recognizing a new constitutional cause of action, but neither does it plainly answer no to the question whether he should have it. Like the combination of public and private land ownership around the ranch, the forums of defense and redress open to Robbins are a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes, and common law rules. It would be hard to infer that Congress expected the Judiciary to stay its Bivens hand, but equally hard to extract any clear lesson that Bivens ought to spawn a new claim. Compare Bush, 462 U. S., at 388 (refusing to create a Bivens remedy when faced with “an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations”); and Schweiker, 487 U. S., at 426 (“Congress chose specific forms and levels of protection for the rights of persons affected”), with Bivens, 403 U. S., at 397 (finding “no explicit congressional declaration that persons injured [in this way] may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress”).
B
This, then, is a case for Bivens step two, for weighing reasons for and against the creation of a new cause of action, the way common law judges have always done. See Bush, supra, at 378. Here, the competing arguments boil down to one on a side: from Robbins, the inadequacy of discrete, incident-by-incident remedies; and from the Government and its employees, the difficulty of defining limits to legitimate zeal on the public’s behalf in situations where hard bargaining is to be expected in the back-and-forth between public and private interests that the Government’s employees engage in every day.
*555 1
As we said, when the incidents are examined one by one, Robbins’s situation does not call for creating a constitutional cause of action for want of other means of vindication, so he is unlike the plaintiffs in cases recognizing freestanding claims: Davis had no other remedy, Bivens himself was not thought to have an effective one, and in Carlson the plaintiff had none against Government officials. Davis, 442 U. S., at 245 (“For Davis, as for Bivens, ‘it is damages or nothing’ ” (quoting Bivens, supra, at 410 (Harlan, J., concurring in judgment))); Carlson, supra, at 23 (“[W]e cannot hold that Congress relegated respondent exclusively to the FTCA remedy” against the Government).
But Robbins’s argument for a remedy that looks at the course of dealing as a whole, not simply as so many individual incidents, has the force of the metaphor Robbins invokes, “death by a thousand cuts.” Brief for Respondent 40. It is one thing to be threatened with the loss of grazing rights, . or to be prosecuted, or to have one’s lodge broken into, but something else to be subjected to this in combination over a period of six years, by a series of public officials bent on making life difficult. Agency appeals, lawsuits, and criminal defense take money, and endless battling depletes the spirit along with the purse. The whole here is greater than the sum of its parts.
2
On the other side of the ledger there is a difficulty in defining a workable cause of action. Robbins describes the wrong here as retaliation for standing on his right as a property owner to keep the Government out (by refusing a free replacement for the right-of-way it had lost), and the mention of retaliation brings with it a tailwind of support from our longstanding recognition that the Government may not retaliate for exercising First Amendment speech rights, see Rankin v. McPherson, 483 U. S. 378 (1987), or certain others *556 of constitutional rank, see, e.g., Lefkowitz v. Turley, 414 U. S. 70 (1973) (Fifth Amendment privilege against self-incrimination); United States v. Jackson, 390 U. S. 570 (1968) (Sixth Amendment right to trial by jury).
But on closer look, the claim against the Bureau’s employees fails to fit the prior retaliation cases. Those cases turn on an allegation of impermissible purpose and motivation; an employee who spoke out on matters of public concern and then was fired, for example, would need to “prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination.” Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668, 675 (1996). In its defense, the Government may respond that the firing had nothing to do with the protected speech, or that “it would have taken the same action even in the absence of the protected conduct.” Ibid. In short, the outcome turns on “what for” questions: what was the Government’s purpose in firing him and would he have been fired anyway? Questions like these have definite answers, and we have established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other characteristics. See McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973).
But a Bivens case by Robbins could not be resolved merely by answering a “what for” question or two. All agree that the Bureau’s employees intended to convince Robbins to grant an easement.[8] But unlike punishing someone for speaking out against the Government, trying to induce someone to grant an easement for public use is a perfectly legitimate purpose: as a landowner, the Government may have, and in this instance does have, a valid interest in get *557 ting access to neighboring lands. The “what for” question thus has a ready answer in terms of lawful conduct.
Robbins’s challenge, therefore, is not to the object the Government seeks to achieve, and for the most part his argument is not that the means the Government used were necessarily illegitimate; rather, he says that defendants simply demanded too much and went too far. But as soon as Robbins’s claim is framed this way, the line-drawing difficulties it creates are immediately apparent. A “too much” kind of liability standard (if standard at all) can never be as reliable a guide to conduct and to any subsequent liability as a “what for” standard, and that reason counts against recognizing freestanding liability in a case like this.
The impossibility of fitting Robbins’s claim into the simple “what for” framework is demonstrated, repeatedly, by recalling the various actions he complains about. Most of them, such as strictly enforcing rules against trespass or conditions on grazing permits, are legitimate tactics designed to improve the Government’s negotiating position. Just as a private landowner, when frustrated at a neighbor’s stubbornness in refusing an easement, may press charges of trespass every time a cow wanders across the property line or call the authorities to report every land-use violation, the Government too may stand firm on its rights and use its power to protect public property interests. Though Robbins protests that the Government was trying to extract the easement for free instead of negotiating, that line is slippery even in this case; the Government was not offering to buy the easement, but it did have valuable things to offer in exchange, like continued. permission for Robbins to use Government land on favorable terms (at least to the degree that the terms of a permit were subject to discretion).[9]
*558 It is true that the Government is no ordinary landowner, with its immense economic power, its role as trustee for the public, its right to cater to particular segments of the public (like the recreational users who would take advantage of the right-of-way to get to remote tracts), and its wide discretion to bring enforcement actions. But in many ways, the Government deals with its neighbors as one owner among the rest (albeit a powerful one). Each may seek benefits from the others, and each may refuse to deal with the others by insisting on valuable consideration for anything in return. And as a potential contracting party, each neighbor is entitled to drive a hard bargain, as even Robbins acknowledges, see Tr. of Oral Arg. 31-32. That, after all, is what Robbins did by flatly refusing to regrant the easement without further recompense, and that is what the defendant employees did on behalf of the Government. So long as they had authority to withhold or withdraw permission to use Government land and to enforce the trespass and land-use rules (as the IBLA confirmed that they did have at least most of the time), they were within their rights to make it plain that Robbins’s willingness to give the easement would determine how complaisant they would be about his trespasses on public land, when they had discretion to enforce the law to the letter.[10]
*559 Robbins does make a few allegations, like the unauthorized survey and the unlawful entry into the lodge, that charge defendants with illegal action plainly going beyond *560 hard bargaining. If those were the only coercive acts charged, Robbins could avoid the “too much” problem by fairly describing the Government behavior alleged as illegality in attempting to obtain a property interest for nothing, but that is not a fair summary of the body of allegations before us, according to which defendants’ improper exercise of the Government’s “regulatory powers” is essential to the claim. Brief for Respondent 21. (Of course, even in that simpler case, the tort or torts by Government employees would be so clearly actionable under the general law that it would furnish only the weakest argument for recognizing a generally available constitutional tort.) Rather, the bulk of Robbins’s charges go to actions that, on their own, fall within the Government’s enforcement power.
It would not answer the concerns just expressed to change conceptual gears and consider the more abstract concept of liability for retaliatory or undue pressure on a property owner for standing firm on property rights; looking at the *561 claim that way would not eliminate the problem of degree, and it would raise a further reason to balk at recognizing a Bivens claim. For at this high level of generality, a Bivens action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests, from negotiating tax claim settlements to enforcing Occupational Safety and Health Administration regulations. Exercising any governmental authority affecting the value or enjoyment of property interests would fall within the Bivens regime, and across this enormous swath of potential litigation would hover the difficulty of devising a “too much” standard that could guide an employee’s conduct and a judicial factfinder’s conclusion.[11]
The point here is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true. The point is the reasonable fear that a general Bivens cure would be worse than the disease.
C
In sum, defendants were acting in the name of the Bureau, which had the authority to grant (and had given) Robbins some use of public lands under its control and wanted a right-of-way in return. Defendants bargained hard by capitalizing on their discretionary authority and Robbins’s violations of various permit terms, though truculence was apparent on both sides. One of the defendants, at least, clearly *562 crossed the line into impermissible conduct in breaking into Robbins’s lodge, although it is not clear from the record that any other action by defendants was more serious than garden-variety trespass, and the Government has successfully defended every decision to eliminate Robbins’s permission to use public lands in the ways he had previously enjoyed. Robbins had ready at hand a wide variety of administrative and judicial remedies to redress his injuries. The proposal, nonetheless, to create a new Bivens remedy to redress such injuries collectively on a theory of retaliation for exercising his property right to exclude, or on a general theory of unjustifiably burdening his rights as a property owner, raises a serious difficulty of devising a workable cause of action. A judicial standard to identify illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tortlike liability when Government employees are unduly zealous in pressing a governmental interest affecting property would invite an onslaught of Bivens actions.
We think accordingly that any damages remedy for actions by Government employees who push too hard for the Government’s benefit may come better, if at all, through legislation. “Congress is in a far better position than a court to evaluate the impact of a new species of litigation” against those who act on the public’s behalf. Bush, 462 U. S., at 389. And Congress can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government’s employees. Ibid. (“[Congress] may inform itself through factfinding procedures such as hearings that are not available to the courts”); cf. Harlow v. Fitzgerald, 457 U. S. 800, 814 (1982) (recognizing “the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties” (internal quotation marks and brackets omitted)).
*563 III
Robbins’s other claim is under RICO, which gives civil remedies to “[a]ny person injured in his business or property by reason of a violation of [18 U. S. C. § 1962].” 18 U. S. C. § 1964(c). Section 1962(e) makes it a crime for “any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity.” RICO defines “racketeering activity” to include “any act which is indictable under” the Hobbs Act as well as “any act or threat involving... extortion ..., which is chargeable under State law and punishable by imprisonment for more than one year.” §§ 1961(1)(A)-(B) (2000 ed., Supp. IV). The Hobbs Act, finally, criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies, § 1951(a), extortion being defined as “the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right,” § 1951(b)(2).
Robbins charges defendants with violating the Hobbs Act by wrongfully trying to get the easement under color of official right, to which defendants reply with a call to dismiss the RICO claim for two independent reasons: the Hobbs Act does not apply when the National Government is the intended beneficiary of the allegedly extortionate acts; and a valid claim of entitlement to the disputed property is a complete defense against extortion. Because we agree with the first contention, we do not reach the second.
The Hobbs Act does not speak explicitly to efforts to obtain property for the Government rather than a private party, and that leaves defendants’ contention to turn on the common law conception of “extortion,” which we presume Congress meant to incorporate when it passed the Hobbs Act in 1946. See Scheidler v. National Organization for Women, Inc., 537 U. S. 393, 402 (2003) (construing the term *564 “extortion” in the Hobbs Act by reference to its common law meaning); Evans v. United States, 504 U. S. 255, 259 (1992) (same); see also Morissette v. United States, 342 U. S. 246, 263 (1952) (“[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken”).
“At common law, extortion was a property offense committed by a public official who took any money or thing of value that was not due to him under the pretense that he was entitled to such property by virtue of his office.” Scheidler, supra, at 402 (quoting 4 W. Blackstone, Commentaries on the Laws of England 141 (1769), and citing 3 R. Anderson, Wharton’s Criminal Law and Procedure §1393, pp. 790-791 (1957); internal quotation marks omitted). In short, “[ejxtortion by the public official was the rough equivalent of what we would now describe as ‘taking a bribe.’” Evans, supra, at 260. Thus, while Robbins is certainly correct that public officials were not immune from charges of extortion at common law, see Brief for Respondent 43, the crime of extortion focused on the harm of public corruption, by the sale of public favors for private gain, not on the harm caused by overzealous efforts to obtain property on behalf of the Government.[12]
The importance of the line between public and private beneficiaries for common law and Hobbs Act extortion is con *565 firmed by our own case law, which is completely barren of an example of extortion under color of official right undertaken for the sole benefit of the Government. See, e. g., McCormick v. United States, 500 U. S. 257, 273 (1991) (discussing circumstances in which public official’s receipt of campaign contributions constitutes extortion under color of official right); Evans, supra, at 257 (Hobbs Act prosecution for extortion under color of official right, where public official accepted cash in exchange for favorable votes on a rezoning application); United States v. Gillock, 445 U. S. 360, 362 (1980) (Hobbs Act prosecution for extortion under color of official right, where state senator accepted money in exchange for blocking a defendant’s extradition and agreeing to introduce legislation); cf. United States v. Deaver, 14 F. 595, 597 (WDNC 1882) (under the “technical meaning [of extortion] in the common law,... [t]he officer must unlawfully and corruptly receive such money or article of value for his own benefit or advantage”). More tellingly even, Robbins has cited no decision by any court, much less this one, from the entire 60-year period of the Hobbs Act that found extortion in efforts of Government employees to get property for the exclusive benefit of the Government.
Of course, there is usually a case somewhere that provides comfort for just about any claim. Robbins musters two for his understanding of extortion under color of official right, neither of which, however, addressed the beneficiary question with any care: People v. Whaley, 6 Cow. 661 (N. Y. 1827), and Willett v. Devoy, 170 App. Div. 203, 155 N. Y. S. 920 (1915). Whaley was about a charge of extortion against a justice of the peace who wrongfully ordered a litigant to pay compensation to the other party as well as a small administrative fee to the court. Because the case involved illegally obtaining property for the benefit of a private third party, it does not stand for the proposition that an act for the benefit of the Government alone can be extortion. The second case, Willett, again from New York, construed a provision of the *566 State’s Public Officers Law. That statute addressed the problem of overcharging by public officers, see 4 Birdseye’s Consol. Laws of N. Y. Ann., Art. V, §67, p. 4640 (1909), and the court’s opinion on it said that common law extortion did not draw any distinction “on the ground that the official keeps the fee himself,” 170 App. Div., at 204,155 N. Y. S., at 921. But a single, two-page opinion from a state intermediate appellate court issued in 1915 is not much indication that the Hobbs Act was adopted in 1946 subject to the understanding that common law extortion was spacious enough to cover the case Robbins states. There is a reason he is plumbing obscurity.
Robbins points to what we said in United States v. Green, 350 U. S. 415, 420 (1956), that “extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property.” He infers that Congress could not have meant to prohibit extortionate acts in the interest of private entities like unions, but ignore them when the intended beneficiary is the Government. See Brief for Respondent 47-48. But Congress could very well have meant just that; drawing a line between private and public beneficiaries prevents suits (not just recoveries) against public officers whose jobs are to obtain property owed to the Government. So, without some other indication from Congress, it is not reasonable to assume that the Hobbs Act (let alone RICO) was intended to expose all federal employees, whether in the Bureau of Land Management, the Internal Revenue Service, the Office of the Comptroller of the Currency (OCC), or any other agency, to extortion charges whenever they stretch in trying to enforce Government property claims. See Sinclair v. Hawke, 314 F. 3d 934, 944 (CA8 2003) (OCC employees “do not become racketeers by acting like aggressive regulators”). As we just suggested, Robbins does not face up to the real problem when he says that requiring proof of a wrongful intent to extort would shield well-intentioned Government employees *567 from liability. It is not just final judgments, but the fear of criminal charges or civil claims for treble damages that could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the Government and the public. This is the reason we would want to see some text in the Hobbs Act before we could say that Congress meant to go beyond the common law preoccupation with official corruption, to embrace the expansive notion of extortion Robbins urges on us.
He falls back to the argument that defendants violated Wyoming’s blackmail statute, see Wyo. Stat. Ann. § 6-2-402 (2005),[13] which he says is a separate predicate offense for purposes of RICO liability. But even assuming that defendants’ conduct would be “chargeable under State law and punishable by imprisonment for more than one year,” 18 U. S. C. §1961(1)(A), it cannot qualify as a predicate offense for a RICO suit unless it is “capable of being generically classified as extortionate,” Scheidler, 537 U. S., at 409, 410; accord, United States v. Nardello, 393 U. S. 286, 296 (1969). For the reasons just given, the conduct alleged does not fit the traditional definition of extortion, so Robbins’s RICO claim does not survive on a theory of state-law derivation.
4= * *
Because neither Bivens nor RICO gives Robbins a cause of action, there is no reason to enquire further into the merits of his claim or the asserted defense of qualified immunity. The judgment of the Court of Appeals for the Tenth Circuit *568 is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Vessels was named as a defendant when the complaint was filed, but he has since died.

 Because this case arises on interlocutory appeal from denial of defendants’ motion for summary judgment, we recite the facts in the light most favorable to Robbins.

 According to Robbins, Bureau officials neglected to mention his right to seek a stay of the Bureau’s adverse action pending the IBLA’s resolution of his appeal. See 43 CFR §4.21 (2006). Such a stay, if granted, would have permitted Robbins to continue to operate under the 5-year SRUP.

 We recognized just last Term that the definition of an element of the asserted cause of action was “directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal.” Hartman v. Moore, 547 U. S. 250, 257, n. 5 (2006). Because the same reasoning applies to the recognition of the entire cause of action, the Court of Appeals had jurisdiction over this issue, as do we.

 There was some uncertainty, if not inconsistency, about the willingness of the IBLA to entertain the sorts of claims Robbins advances here. Compare In re Robbins, 146 I. B. L. A. 213, 219 (1998) (rejecting a claim of “ ‘blackmail’ ” on the merits), with Robbins v. Bureau of Land Management, 170 I. B. L. A. 219, 226 (2006) (holding that “the trespass decision must be upheld regardless of BLM’s motive in issuing the decision”). In *552 any event, he could have advanced the claims in federal court whether or not the IBLA was willing to listen to them. Cf. In re Robbins, 167 I. B. L. A. 239, 241 (2005) (noting that Robbins “concede[d] that these assertions [of equal protection violations and harassment] are properly cognizable by a court and he raise[d] them only to preserve them as part of the record”).

 Robbins brought a Fourth Amendment claim for malicious prosecution in this litigation, but the District Court dismissed it, Robbins v. Bureau of Land Management, 252 F. Supp. 2d 1286, 1295-1298 (Wyo. 2003), and Robbins has pursued it no further.

 We are aware of no Wyoming case considering this tort.

 This is the “simple” question Robbins presents for review: “[C]an government officials avoid the Fifth Amendment’s prohibition against taking property without just compensation by using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment?” Brief for Respondent 21.

 In light of Justice Ginsburg’s emphasis on the extent and duration of the harm suffered by Robbins, we do not read her opinion to suggest that any single adverse action taken by the Government in response to a valid exercise of property rights would give rise to a retaliation claim. It thus appears that even if a “what for” question could be imported into *558 this case, Robbins could not obtain relief without also satisfying an unspecified, and unworkable, “too much” standard.

 Justice Ginsburg says we mistakenly fail to see that Robbins’s retaliation claim presents only a “what for” question: did defendants take the various actions against Robbins in retaliation for refusing to grant the desired right-of-way gratis (or simply out of malice prompted by Robbins’s refusal and their own embarrassment after forgetting to record the Nelson grant)? But seeing the case as raising only a traditional “what for” question gives short shrift to the Government’s right to bargain hard in a continuing contest.
In the standard retaliation case recognized in our precedent, the plaintiff has performed some discrete act in the past, typically saying some *559 thing that irritates the defendant official; the question is whether the official’s later action against the plaintiff was taken for a legitimate purpose (firing to rid the work force of a substandard performer, for example) or for the purpose of punishing for the exercise of a constitutional right (that is, retaliation, probably motivated by spite). The plaintiff’s action is over and done with, and the only question is the defendant’s purpose, which may be maliciously motivated.
In this case, however, the past act or acts (refusing the right-of-way without compensation) are simply particular steps in an ongoing refusal to grant requests for a right-of-way. The purpose of the continuing requests is lawful (the Government still could use the right-of-way), and there are actions the Government may lawfully take to induce or coerce Robbins to end his refusal (presumably like canceling the nonpermanent reciprocal right-of-way originally given to Nelson). The action claimed to be retaliatory may gratify malice in the heart of the official who takes it, but the official act remains an instance of hard bargaining intended to induce the plaintiff to come to legitimate terms. We do not understand Robbins to contend that malice alone, as distinguished from malice combined with the desire to acquire an easement, caused defendants to act the way they did. See Brief for Respondent 21 (accusing defendants of “using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment”); but cf. post, at 578-579, n. 3 (Ginsburg, J., concurring in part and dissenting in part) (‘“Their cause, if they had one, is nothing to them now; They hate for hate’s sake’ ” (quoting There Will Be No Peace, reprinted in W. H. Auden: Collected Poems 615 (E. Mendelson ed. 2007))). Thus, we are not dealing •with one discrete act by a plaintiff and one discrete (possibly retaliatory) act by a defendant, the purpose of which is in question. Instead we are confronting a continuing process in which each side has a legitimate purpose in taking action contrary to the other’s interest.
“Retaliation” cannot be classed as a basis of liability here, then, except on one or the other of two assumptions. The first is that the antagonistic acts by the officials extend beyond the scope of acceptable means for accomplishing the legitimate purpose; the acts go beyond hard bargaining on behalf of the Government (whatever spite may lurk in the defendant’s heart). They are “too much.” The second assumption is that the presence of malice or spite in an official’s heart renders any action unconstitu *560 tionally retaliatory, even if it would otherwise have been done in the name of legitimate hal’d bargaining. The motive-is-all test is not the law of our retaliation precedent. If a spiteful heart rendered any official efforts actionable as unconstitutional retaliation, our retaliation discharge cases would have asked not only whether the plaintiff was fired for cause (and would have been fired for cause anyway), but whether the official who discharged the plaintiff tainted any legitimate purpose with spitefulness in firing this particular, outspoken critic. But we have taken no such position; to the contrary, we have held that proof that the action was independently justified on grounds other than the improper one defeats the claim. See Mt. Healthy City Bd. of Ed. v. Doyle, 429 U. S. 274, 287 (1977). Any other approach would have frustrated an employer’s legitimate interest in securing a competent work force (comparable to the Government’s interest as a landowner here), and would have introduced the complication of proving motive even in cases in which the action taken was plainly legitimate.
Since Justice Ginsburg disclaims the second alternative, post, at 580, n. 6, the acts of spite and ill will that she emphasizes will necessarily count in a “too much” calculation.

 Justice Ginsbueg points out that apprehension of many lawsuits is not a good reason to refrain from creating a Bivens action. Post, at 577, 582. But there is a world of difference between a popular Bivens remedy for a well-defined violation, on the one hand, and (on the other) litigation invited because the elements of a claim are so unclear that no one can tell in advance what claim might qualify or what might not. We ground our judgment on the elusiveness of a limiting principle for Robbins’s claim, not on the potential popularity of a claim that could be well defined.

 Although the legislative history of the Hobbs Act is generally “sparse and unilluminating with respect to the offense of extortion,” Evans, 504 U. S., at 264, we know that Congress patterned the Act after two sources of law: “the Penal Code of New York and the Field Code, a 19th-century model penal code,” Scheidler, 537 U. S., at 403. In borrowing from these sources, the Hobbs Act expanded the scope of common law extortion to include private perpetrators while retaining the core idea of extortion as a species of corruption, akin to bribery. But Robbins provides no basis for believing that Congress thought of broadening the definition of extortion under color of official right beyond its common law meaning.

 Section 6-2-402 provides:
“(a) A person commits blackmail if, with the intent to obtain property of another or to compel action or inaction by any person against his will, the person:
“(ii) Accuses or threatens to accuse a person of a crime or immoral conduct which would tend to degrade or disgrace the person or subject him to the ridicule or contempt of society.”