Justice Alito,
concurring in part and concurring in the judgment.
I join Justice Kennedy’s opinion in all respects but one: I would not remand this case for the lower courts to decide whether implementation of the land-transfer statute enacted by Congress in 2003, Department of Defense Appropriations Act, 2004, §8121, would violate the District Court’s injunction or the Establishment Clause. The factual record has been sufficiently developed to permit resolution of these questions, and I would therefore decide them and hold that the statute may be implemented.
The singular circumstances surrounding the monument on Sunrise Rock presented Congress with a delicate problem, and the solution that Congress devised is true to the spirit of practical accommodation that has made the United States a Nation of unparalleled pluralism and religious tolerance. In brief, the situation that Congress faced was as follows.
After service in the First World War, a group of veterans moved to the Mojave Desert, in some cases for health reasons.[1] They joined the Veterans of Foreign Wars (VFW), *724 Death Valley Post 2884, and in 1934, they raised a simple white cross on an outcropping called Sunrise Rock to honor fallen American soldiers.[2] These veterans selected Sunrise Rock “in part because they believed there was a color shading on the Rock in the shape of an American soldier or ‘doughboy.’ ”[3]
One of these men was John Riley Bembry, a miner who had served as a medic and had thus presumably witnessed the carnage of the war firsthand.[4] It is said that Mr. Bembry was not a particularly religious man, but he nevertheless agreed to look after the cross and did so for some years.[5]
The Sunrise Rock monument was located on land belonging to the Federal Government, but in this part of the country, where much of the land is federally owned, boundaries between Government and private land are often not marked,[6] and private citizens are permitted to go on and to use federal land for a variety of purposes.[7] Although Sunrise Rock was federally owned, Mr. Bembry and his fellow *725 veterans took it upon themselves to place their monument on that spot, apparently without obtaining approval from any federal officials, and this use of federal land seems to have gone largely unnoticed for many years, in all likelihood due to the spot’s remote and rugged location.
Sunrise Rock is situated far from any major population center; temperatures often exceed 100 degrees Fahrenheit in the summer; and visitors are warned of the dangers of traveling in the area.[8] As a result, at least until this litigation, it is likely that the cross was seen by more rattlesnakes than humans.
Those humans who made the trip to see the monument appear to have viewed it as conveying at least two significantly different messages. See Pleasant Grove City v. Summum, 555 U. S. 460, 474 (2009) (“The meaning conveyed by a monument is generally not a simple one,” and a monument may be “interpreted by different observers, in a variety of ways”). The cross is of course the preeminent symbol of Christianity, and Easter services have long been held on Sunrise Rock, Buono v. Norton, 371 F. 3d 543, 548 (CA9 2004). But, as noted, the original reason for the placement of the cross was to commemorate American war dead and, particularly for those with searing memories of the Great War, the symbol that was selected, a plain unadorned white cross, no doubt evoked the unforgettable image of the white crosses, row on row, that marked the final resting places of so many American soldiers who fell in that conflict.
This is roughly how things stood until the plaintiff in this case, an employee of the National Park Service who sometimes viewed the cross during the performance of his duties and claims to have been offended by its presence on federally owned land, brought this suit and obtained an injunction re *726 straining the Federal Government from “permitting the display of the Latin cross in the area of Sunrise Rock.” App. to Pet. for Cert. 146a. After the Ninth Circuit affirmed that decision, and the Government elected not to seek review by this Court, Congress faced a problem.
If Congress had done nothing, the Government would have been required to take down the cross, which had stood on Sunrise Rock for nearly 70 years, and this removal would have been viewed by many as a sign of disrespect for the brave soldiers whom the cross was meant to honor. The demolition of this venerable, if unsophisticated, monument would also have been interpreted by some as an arresting symbol of a Government that is not neutral but hostile on matters of religion and is bent on eliminating from all public places and symbols any trace of our country’s religious heritage. Cf. Van Orden v. Perry, 545 U. S. 677, 704 (2005) (Breyer, J., concurring in judgment).
One possible solution would have been to supplement the monument on Sunrise Rock so that it appropriately recognized the religious diversity of the American soldiers who gave their lives in the First World War. In American military cemeteries overseas, the graves of soldiers who perished in that war were marked with either a white cross or a white Star of David.[9] More than 3,500 Jewish soldiers gave their lives for the United States in World War I,[10] *727 and Congress might have chosen to place a Star of David on Sunrise Rock so that the monument would duplicate those two types of headstones. But Congress may well have thought — not without reason — that the addition of yet another religious symbol would have been unlikely to satisfy the plaintiff, his attorneys, or the lower courts that had found the existing monument to be unconstitutional on the ground that it impermissibly endorsed religion.
Congress chose an alternative approach that was designed to eliminate any perception of religious sponsorship stemming from the location of the cross on federally owned land, while at the same time avoiding the disturbing symbolism associated with the destruction of the historic monument. The mechanism that Congress selected is one that is quite common in the West, a “land exchange.”[11] Congress enacted a law under which ownership of the parcel of land on which Sunrise Rock is located would be transferred to the VFW in exchange for another nearby parcel of equal value. Congress required that the Sunrise Rock parcel be used for a war memorial, § 8121(a), 117 Stat. 1100, but Congress did not prevent the VFW from supplementing the existing monument or replacing it with a war memorial of a different design. Although Justice Stevens characterizes this land exchange as one that endorses “a particular religious view,” post, at 760 (dissenting opinion), it is noteworthy that Congress, in which our country's religious diversity is well represented, passed this law by overwhelming majorities: 95-0 in the Senate and 407-15 in the House. See 149 Cong. Rec. 23110 (2003); id., at 23306. In my view, there is no legal ground for blocking the implementation of this law.
*728 Justice Stevens contends that the land transfer would violate the District Court injunction, but that argument, for the reasons explained in Justice Scalia’s opinion, see post, at 730 (concurring in judgment), is plainly unsound. The obvious meaning of the injunction was simply that the Government could not allow the cross to remain on federal land.
There is also no merit in Justice Stevens’ contention that implementation of the statute would constitute an endorsement of Christianity and would thus violate the Establishment Clause. Assuming that it is appropriate to apply the so-called “endorsement test,” this test would not be violated by the land exchange. The endorsement test views a challenged display through the eyes of a hypothetical reasonable observer who is deemed to be aware of the history and all other pertinent facts relating to a challenged display. See ante, at 720-721 (plurality opinion). Here, therefore, this observer would be familiar with the origin and history of the monument and would also know both that the land on which the monument is located is privately owned and that the new owner is under no obligation to preserve the monument’s present design. With this knowledge, a reasonable observer would not view the land exchange as the equivalent of the construction of an official World War I memorial on the National Mall. Cf. post, at 759 (Stevens, J., dissenting). Rather, a well-informed observer would appreciate that the transfer represents an effort by Congress to address a unique situation and to find a solution that best accommodates conflicting concerns.
Finally, I reject Justice Stevens’ suggestion that the enactment of the land-transfer law was motivated by an illicit purpose. Post, at 757. I would not be “so dismissive of Congress.” Citizens United v. Federal Election Comm’n, 558 U. S. 310, 460 (2010) (Stevens, J., concurring in part and dissenting in part). Congress has shown notable solicitude for the rights of religious minorities. See, e. g., Religious Freedom Restoration Act of 1993, 42 U. S. C. § 2000bb et seq.; *729 Religious Land Use and Institutionalized Persons Act of 2000, 42 U. S. C. §2000cc et seq. I would not jump to the conclusion that Congress’ aim in enacting the land-transfer law was to embrace the religious message of the cross; rather, I see no reason to doubt that Congress’ consistent goal, in legislating with regard to the Sunrise Rock monument, has been to commemorate our Nation’s war dead and to avoid the disturbing symbolism that would have been created by the destruction of the monument.
For these reasons, I would reverse the decision below and remand with instructions to vacate the order prohibiting the implementation of the land-transfer statute.

 See Memorandum from Mark Luellen, Historian, Dept. of Interior, to Superintendent, Mojave National Preserve (Jan. 31,2000) (Luellen Memo), Ded. of Charles R. Shoekey in Buono v. Norton, No. EDCV01-216-RT (SGLx) (CD Cal., Mar. 13, 2002) (Exh. 17); Brief for VFW et al. as Amici *724 Curiae 6-7,15 (hereinafter VFW Brief); see also B. Ausmus, East Mojave Diary 116 (1989) (hereinafter Ausmus).

 See Luellen Memo; VFW Brief 15-16.

 id, at 15.

 See Tr. of Oral Arg. 55; VFW Brief 7,16; see also Ausmus 116.

 See VFW Brief 7,16.

 See App. 79, 81 (testimony of respondent) (noting that when he first saw the monument, he did not know whether it was on public or private land); id., at 80 (describing Mojave Preserve as “primarily federal land with a large amount of inholdings of non-federal land”); see also Wilkie v. Robbins, 551 U. S. 537, 541-543 (2007).

 See Taylor Grazing Act, 48 Stat. 1269, as amended, 43 U. S. C. § 315 et seq.; General Mining Act of 1872, Rev. Stat. §2319, 30 U. S. C. §22; Andrus v. Shell Oil Co., 446 U. S. 657, 658 (1980); see also E. Nystrom, Dept. of Interior, National Park Service, From Neglected Space To Protected Place: An Administrative History of Mojave National Preserve, ch. 2 (Mar. 2003) (describing mining and grazing in Mojave Preserve), online at http://ww.nps.gov/history/history/online_books/moja/adhi.htm (all Internet materials as visited Apr. 23, 2010, and available in Clerk of Court’s case file).

 See Dept. of Interior, National Park Service, Mojave National Preserve, Operating Hours & Seasons, http://www.nps.gov/moja/planyourvisit/ hours.htm; D. Casebier, Mojave Road Guide: An Adventure Through Time 114 (1999); Buono v. Norton, 371 P. 3d 543, 549 (CA9 2004).

 See D. Holt, American Military Cemeteries 473, 474 (1992); see also American Battle Monuments Commission, http://vmw.abmc.gov/cemeteries/ cemeteries.php (containing photographs of the two types of markers). This policy presumably reflected the religious makeup of the Armed Forces at the time of the First World War. Today, veterans and their families may select any of 39 types of headstones. See Dept. of Veterans Affairs, Available Emblems of Belief for Placement on Government Headstones and Markers, http://www.cem.va.gov/hm/hmemb.asp.

 See J. Fredman & L. Falk, Jews in American Wars 100-101 (5th ed. 1954); Brief for Jewish War Veterans of the United States of America, Inc., as Amicus Curiae 33.

 See G. Draffan & J. Blaeloch, Commons or Commodity? The Dilemma of Federal Land Exchanges 10 (2000). Congressionally authorized land exchanges are common. See, e. g., Consolidated Natural Resources Act of 2008, § 101(d), 122 Stat. 758; National Defense Authorization Act for Fiscal Year 2008, §2845, 122 Stat. 554; City of Yuma Improvement Act, §3, 120 Stat. 3369; Act of Dec. 23, 2004, § 1, 118 Stat. 3919.