**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ADEL HASSAN HAMAD,
*Plaintiff-Appellant –*
*Cross-Appellee*,

v.

ROBERT M. GATES, in his
individual capacity; DONALD
H. RUMSFELD, in his
individual capacity; PAUL
WOLFOWITZ, in his individual
capacity; GORDON R.
ENGLAND, in his individual
capacity; JAMES M.
MCGARRAH, in his individual
capacity; RICHARD BOWMAN
MYERS, in his individual
capacity; PETER PACE, in his
individual capacity; MICHAEL
GLENN MULLEN, in his
individual capacity, AKA
Mike Mullen; JAMES T. HILL,
in his individual capacity;
BANTZ J. CRADDOCK, in his
individual capacity;
GEOFFREY D. MILLER, in his
individual capacity; JAY
HOOD, in his individual
capacity; HARRY B. HARRIS,

Nos.  12-35395
12-35489

D.C. No.
2:10-cv-00591-
MJP

OPINION

JR., in his individual capacity;
MARK H. BUZBY, in his
individual capacity; ADOLPH
MCQUEEN, in his individual
capacity; NELSON CANNON,
in his individual capacity;
MICHAEL BUMGARNER, in his
individual capacity, AKA
Mike Bumgarner; WADE
DENNIS, in his individual
capacity; BRUCE VARGO, in
his individual capacity;
ESTABAN RODRIGUEZ, in his
individual capacity, AKA
Stephen Rodriguez, AKA
Steve Rodriguez; DANIEL K.
MCNEILL, in his individual
capacity; GREGORY J. IHDE,
in his individual capacity;
JOHN DOES 1-100, in their
individual capacities; UNITED
STATES OF AMERICA,
        *Defendants-Appellees –*
                *Cross-Appellants*.

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued and Submitted
June 3, 2013—Seattle, Washington

Filed October 7, 2013

Before: Arthur L. Alarcón, M. Margaret McKeown,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY*

### Subject Matter Jurisdiction

The panel held that 28 U.S.C. § 2241(e)(2) deprived the district court of subject matter jurisdiction over the claims of Adel Hassan Hamad, who was detained at Guantanamo Bay as an enemy combatant, and vacated the district court's order dismissing Hamad's claims seeking damages from former Secretary of Defense Robert Gates and other military and civilian officials.

The panel held that the plain language of § 2241(e)(2) clearly applied to Hamad's claims. The panel held that the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), did not address § 2241(e)(2), and therefore did not strike it down. The panel further held that in striking down § 2241(e)(1) in *Boumediene*, the Supreme Court did not necessarily strike down § 2241(e)(2), which is severable from § 2241(e)(1), and which remained in effect, provided it was constitutional. Finally, the panel held that § 2241(e)(2) was constitutional as applied to Hamad because: § 2241(e)(2)

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was not unconstitutional as applied to Hamad's money damages; § 2241(e)(2) was not a bill of attainder because it did not inflict legislative punishment; and § 2241(e)(2) did not violate the equal protection component of the Due Process Clause of the Fifth Amendment.

## COUNSEL

Gwynne Skinner (argued), Williamette University College of Law, Salem, Oregon; Paul Hoffman (argued), Schonbrun De Simone Seplow Harris Hoffman & Harrison LLP, Venice, California, for Plaintiff-Appellant/Cross-Appellee.

Stuart F. Delery, Acting Assistant Attorney General; Jenny Durkan, United States Attorney; Robert M. Loeb and Sydney Foster (argued), Attorneys, Appellate Staff, Civil Division, United States Department of Justice, Washington D.C., for Defendant-Appellees/Cross-Appellants.

**OPINION**

IKUTA, Circuit Judge:

Adel Hassan Hamad was detained at Guantanamo Bay as an enemy combatant. He seeks damages for his detention and his treatment from former Secretary of Defense Robert Gates and numerous other military and civilian officials. We conclude, however, that 28 U.S.C. § 2241(e)(2) deprived the district court of subject-matter jurisdiction over Hamad's claims.

I

Hamad, a citizen of Sudan, alleges that he was detained in Pakistan in 2002 by Pakistani security forces acting under the direction of an "unknown American official." According to Hamad, he was transferred to United States military custody and detained, first at Bagram Airfield in Afghanistan, and then at Guantanamo Bay.

In July 2004, the Department of Defense established Combatant Status Review Tribunals (CSRTs) to determine whether foreign nationals held at Guantanamo Bay qualified for detention as "enemy combatants." *Boumediene v. Bush*, 553 U.S. 723, 733 (2008); Memorandum from Deputy Secretary of Defense Paul Wolfowitz re Order Establishing Combatant Status Review Tribunal § a (July 7, 2004), *available at* http://www.defense.gov/news/Jul2004/ d20040707review.pdf (Wolfowitz Memo.). The Department of Defense defined the term "enemy combatant" as "'an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners.'" *Hamdan*

*v. Rumsfeld*, 548 U.S. 557, 570 n.1 (2006) (quoting Wolfowitz Memo. at 1). A CSRT determined in March 2005 that Hamad was an enemy combatant. The United States has not rescinded this designation.

In addition to establishing the CSRT procedure, the Department of Defense established Administrative Review Boards (ARBs) to "determine annually if enemy combatants detained . . . [at] Guantanamo Bay, Cuba should be released, transferred or continue to be detained" based on an assessment of various factors, including the continued threat posed by each detainee. Memorandum from Deputy Secretary of Defense Gordon England re Revised Implementation of Administrative Review Procedures § 1, Enclosure 3 § 1 (July 14, 2006), *available at* http://www.defense.gov/news/Aug2006/d20060809arbproc eduresmemo.pdf (England Memo.); *see also Boumediene*, 553 U.S. at 821 (Roberts, C.J., dissenting) (describing the ARB process). ARBs were required to issue recommendations as to whether to (1) "[r]elease the enemy combatant without limitations" to another country; (2) "[t]ransfer the enemy combatant to . . . [another country] with conditions agreed upon between that [country] and the United States"; or (3) "[c]ontinue to detain the enemy combatant." *See* England Memo., Enclosure 3 § 1.

In November 2005, an ARB panel determined that Hamad continued to be a threat to the United States and its allies, but also decided that he was eligible to be transferred to Sudan. As a result, in 2007, after the United States concluded

negotiations with Sudan, Hamad was transferred to that country.[1]

In April 2010, Hamad filed an action for money damages in a federal district court in Washington State against twenty-two United States military and civilian government officials, including former United States Secretary of Defense Robert Gates,[2] and one hundred unnamed federal officials, all in their individual capacities. In his complaint, Hamad raised six claims under state common law and the Alien Tort Statute, 28 U.S.C. § 1350. These six claims alleged violations of customary international law and the Geneva Conventions, including (1) prolonged arbitrary detention, (2) cruel, inhuman, or degrading treatment, (3) torture, (4) targeting of a civilian, (5) denial of due process, and (6) forced disappearance. In addition to these six claims, Hamad's seventh claim alleged a violation of his Fifth Amendment due process rights. Hamad's claims are premised on his allegations that he was wrongfully detained and subjected to torture and other forms of cruel treatment. He contends that the CSRT erred in determining that he was an enemy combatant, and that the United States government detained him unlawfully for over two years after the ARB decided to transfer him.

---

[1] The ARB decision was heavily redacted and the explanation and reasoning for the panel's decision is blacked out. In addition, the record does not contain the transfer agreement between the United States and Sudan.

[2] Gates became Secretary of Defense in December 2006. Because Hamad was transferred from Guantanamo in December 2007, Gates's tenure as Secretary overlapped with Hamad's detention at Guantanamo for one year.

The district court dismissed all defendants other than Gates for lack of personal jurisdiction. With respect to Hamad's six international law claims against Gates, the district court granted the government's motion to substitute itself for Gates under the Westfall Act, 28 U.S.C. § 2679(d)(1). Because the district court concluded that the government had not waived its sovereign immunity for these international law claims, *see id.* §§ 2679(b)(1), 2680(k), it dismissed them. With respect to Hamad's sole remaining claim, a Fifth Amendment claim against Gates, the district court held that it had subject matter jurisdiction over this claim, but dismissed it because the complaint did not plausibly allege that Gates was personally involved in violating Hamad's rights. Hamad timely appealed and the government cross appealed.

II

This appeal requires us to address a key threshold question: whether the district court had jurisdiction over the subject matter of this action, given the jurisdiction-stripping provisions in 28 U.S.C. § 2241(e). This section provides:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
>
> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee

Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

28 U.S.C. § 2241(e).

"The existence of subject matter jurisdiction is a question of law that we review de novo." *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 944 (9th Cir. 2009).

A

Looking to the plain language of § 2241(e)(2), it is clear that this provision applies to Hamad's claims, and that, as a result, "no court, justice, or judge" has authority to hear Hamad's action. Under § 2241(e)(2), courts lack jurisdiction over an action that meets the following five requirements: (1) the action is against the "United States or its agents"; (2) the action relates to "any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States"; (3) the action relates to an alien who was "determined by the United States to have been properly detained as an enemy combatant" or an alien awaiting such a determination; (4) the action is an action "other" than an application for a writ of habeas corpus, which

is covered in § 2241(e)(1); and (5) the action does not qualify for an exception under § 1005(e)(2) or (3) of the Detainee Treatment Act of 2005 (DTA), which provide the D.C. Circuit jurisdiction over a narrow class of challenges by enemy combatants, *see* Detainee Treatment Act of 2005, Pub. L. No. 109-148, div. A, title X, § 1005(e), 119 Stat. 2680, 2740–44.

Hamad's action meets each of these requirements. It is "against the United States or its agents" and relates to aspects of Hamad's "detention" and "treatment" (the first and second requirements), because Hamad is seeking damages from United States military and civilian officers for his detention and treatment at Guantanamo. Hamad's action satisfies the third requirement, because there is no dispute that a CSRT determined that Hamad was properly detained as an enemy combatant. It also meets the fourth requirement, because Hamad is not seeking a writ of habeas corpus. Finally, Hamad's claims do not fall into the narrow exception granted by § 2241(e)(2) for suits under § 1005(e)(2) or (3) of the DTA, which authorize limited D.C. Circuit review. Therefore Hamad's action also satisfies the fifth requirement.

B

Although § 2241(e)(2) applies by its terms, Hamad contends that, in light of Supreme Court precedent and constitutional concerns, we may not apply § 2241(e)(2) to his action. He makes three arguments. First, he asserts that *Boumediene* struck down the whole of § 2241(e), including § 2241(e)(2). Second, he asserts that, even if *Boumediene* struck down only § 2241(e)(1), § 2241(e)(2) cannot be severed from (e)(1) and so both must fall together. Finally,

he asserts that, even if § 2241(e)(2) survived *Boumediene*, it is unconstitutional as applied to him.

In order to analyze these arguments, we must first review the complex historical context which forms their backdrop.

1

"On September 11, 2001, the al Qaeda terrorist network used hijacked commercial airliners to attack prominent targets in the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004). In response, Congress authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . , or harbored such organizations or persons." Authorization for Use of Military Force of 2001, Pub. L. 107-40, § 2, 115 Stat. 224, 224. "In *Hamdi* . . . five Members of the Court recognized that detention of individuals who fought against the United States in Afghanistan for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the necessary and appropriate force Congress has authorized the President to use." *Boumediene*, 553 U.S. at 733 (internal quotation marks omitted). On the same day it issued its opinion in *Hamdi*, the Supreme Court also issued *Rasul v. Bush*, which held that federal courts had jurisdiction under the then-effective version of the habeas statute, 28 U.S.C. § 2241, "to hear [Guantanamo detainees'] habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base." 542 U.S. 466, 484 (2004). Taken together, *Hamdi* and *Rasul* established that the President had the authority to detain individuals pursuant to the Authorization for Use of Military Force, but that detainees

held at Guantanamo Bay had a statutory right to file habeas petitions in federal court to challenge their detention.

Shortly after the Supreme Court decided *Hamdi* and *Rasul*, the Department of Defense "established Combatant Status Review Tribunals (CSRTs) to determine whether individuals detained at Guantanamo were 'enemy combatants,' as the Department define[d] that term." *Boumediene*, 553 U.S. at 733. The Department of Defense defined "enemy combatant" as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." *Hamdan*, 548 U.S. at 570 n.1. (internal quotation marks omitted).

In 2005, Congress responded to the Supreme Court's decision in *Rasul*, as well as the Executive's decision to establish Combatant Status Review Tribunals, by enacting the Detainee Treatment Act of 2005 (DTA), Pub. L. No. 109-148, div. A, title X, 119 Stat. 2680, 2739–44. In direct response to *Rasul*'s holding that § 2241 gave federal courts jurisdiction to hear habeas petitions by Guantanamo detainees, the DTA amended § 2241 to include a new subsection, § 2241(e), which limited the jurisdiction of the courts to entertain suits by Guantanamo detainees.[3]     *See* DTA § 1005(e)(1).

---

[3] Section 1005(e)(1) of the DTA provides:

> In General—Section 2241 of title 28, United States Code, is amended by adding at the end the following:
>
> > (e) Except as provided in section 1005 of the Detainee Treatment Act of 2005, no court, justice, or judge shall have jurisdiction to hear or consider—

Specifically, this amendment to 28 U.S.C. § 2241 imposed two additional jurisdictional limitations:   first, "no court, justice, or judge" could entertain "an application for a writ of habeas corpus filed by" a Guantanamo detainee; and second, no court could entertain "any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay." *Id.*

Congress provided two exceptions to this jurisdiction-stripping language in § 1005(e)(2) and (3) of the DTA.  First, building on the Executive's creation of CSRTs, § 1005(e)(2) permitted the D.C. Circuit to review "the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant."   DTA § 1005(e)(2)(A).  Specifically, the D.C. Circuit could review (1) whether a final decision of a CSRT was consistent with

(1) an application for writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba; or

(2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who—

(A) is currently in military custody; or

(B) has been determined by the United States Court of Appeals for the District of Columbia Circuit in accordance with the procedures set forth in section 1005(e) of the Detainee Treatment Act of 2005 to have been properly detained as an enemy combatant.

certain specified procedures, and (2) whether those procedures complied with the Constitution and applicable federal law.    DTA § 1005(e)(2)(C).[4]    Second, DTA § 1005(e)(3) allowed the D.C. Circuit to perform a limited review of convictions by military tribunals.[5]

---

[4] DTA § 1005(e)(2)(C) provides:

> Scope of Review—The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on any claims with respect to an alien under this paragraph shall be limited to the consideration of—
>
> > (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and
>
> > (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

[5] DTA § 1005(e)(3) provides, in pertinent part:

> (A) In General—Subject to subparagraphs (B), (C), and (D), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of any final decision rendered pursuant to Military Commission Order No. 1, dated August 31, 2005 (or any successor military order). . . .

In sum, the DTA permitted the D.C. Circuit to conduct a limited review of the detention and convictions of enemy combatants, but it stripped any court of jurisdiction to entertain habeas petitions or any other actions filed by detainees determined to be enemy combatants or awaiting such a determination.

Less than a year later, the Supreme Court held that the DTA's jurisdiction-stripping amendments to § 2241 did not apply to cases pending before the DTA's effective date. *See Hamdan*, 548 U.S. at 576–78, 584 & n.15. The Court reached this conclusion because the DTA expressly provided that the limited review procedures of § 1005(e)(2) and (3) applied to pending cases, but was silent about whether the jurisdiction-stripping amendments to § 2241 also applied to these pending cases. *Id.* at 574–76.

Congress responded once again by enacting the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600. Section 7 of the MCA amended 28 U.S.C.

---

(D) Scope of Review—The jurisdiction of the United States Court of Appeals for the District of Columbia Circuit on an appeal of a final decision with respect to an alien under this paragraph shall be limited to the consideration of—

(i) whether the final decision was consistent with the standards and procedures specified in the military order referred to in subparagraph (A); and

(ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and laws of the United States.

§ 2241(e) again, broadening its jurisdiction-stripping language.[6] *Id.* § 7, 120 Stat. 2600, 2635–36. In direct

---

[6] Section 7 of the MCA states:

(a) In General.—Section 2241 of title 28, United States Code, is amended by striking [the existing subsection (e)] . . . and inserting the following new subsection (e):

"(e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

"(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note) [giving the D.C. Circuit exclusive jurisdiction to review decisions of the CSRTs and military commissions], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination."

(b) Effective Date.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

response to *Hamdan*'s holding, Congress made unmistakably clear that the jurisdiction-stripping language of § 2241(e) *would* apply to pending cases. MCA § 7(b) ("The amendment made by subsection (a) [adding the new § 2241(e)] shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."). No further changes have been made to the language of § 2241(e) since this amendment.

The Supreme Court considered this amendment to § 2241(e) in *Boumediene*. Like in *Hamdan*, the petitioners in *Boumediene* argued that § 7 of the MCA and its amendments to § 2241(e) were "not a sufficiently clear statement of congressional intent to strip the federal courts of jurisdiction in pending [habeas] cases." *Boumediene*, 553 U.S. at 737. The Supreme Court rejected this argument, concluding that Congress had finally succeeded in expressing its intent to apply the amendments to § 2241(e) in all pending cases and to deprive the federal courts of jurisdiction to entertain habeas corpus actions by Guantanamo detainees designated as enemy combatants. *Id.* at 738–39.

Because the Supreme Court interpreted the amendment to § 2241(e) as depriving petitioners of the privilege of habeas corpus, it had to address the petitioners' further argument that such a deprivation was unconstitutional as a violation of the Suspension Clause. Under the Suspension Clause, "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

To address this constitutional argument, the Court had to first determine whether habeas corpus jurisdiction extended to foreign nationals detained outside of the boundaries of the United States. *Boumediene*, 553 U.S. at 739. After a thorough review of the history of the writ of habeas corpus and an analysis of earlier Supreme Court decisions considering the application of the writ to enemy aliens abroad, the Supreme Court concluded, as a matter of first impression, that the protection of the Suspension Clause extended to individual detainees at Guantanamo. *Id.* at 771. Accordingly, Congress could not enact a statute depriving Guantanamo detainees of the privilege of the writ of habeas corpus unless Congress's actions complied with the requirements of the Suspension Clause. *Id.* Because Congress's enactment of the MCA did not so comply, the Court concluded that petitioners could challenge their detention by means of a petition for habeas corpus. *Id.* Next, the Court determined that the limited D.C. Circuit Review provided by the DTA was not a sufficient substitute procedure for habeas, in part because it did not give detainees a sufficient ability to present exculpatory evidence. *Id.* at 789. The Court thus held that § 7 of the MCA "effects an unconstitutional suspension of the writ." *Id.* at 792.[7]

---

[7] *Boumediene*'s ruling that Guantanamo detainees have a constitutional right to file habeas petitions led to the elimination of § 1005(e)(2) and (3), the provisions in the DTA that gave the D.C. Circuit authority to review challenges to CSRT procedures and military tribunal convictions. Soon after *Boumediene* was decided, the D.C. Circuit struck down § 1005(e)(2) of the DTA, which had authorized it to hear certain narrow challenges to CSRT detention determinations. *Bismullah v. Gates*, 551 F.3d 1068, 1072–73 (D.C. Cir. 2009). The D.C. Circuit reasoned that Congress had enacted this provision as a "substitute for and not a supplement to habeas corpus," *id.* at 1072, and thus the provision served no purpose after *Boumediene* held that detainees could bring habeas petitions. *Id.* at

Because *Boumediene*'s holding and analysis focused on Congress's authority to suspend habeas corpus at Guantanamo Bay, it did not analyze whether § 2241(e)(2) was constitutional. Nor did the Court address the question whether constitutional provisions other than the Suspension Clause, such as the Fifth Amendment, are applicable to Guantanamo detainees.

2

We now consider Hamad's arguments in light of this historical context. Implicitly acknowledging that § 2241(e)(2) would bar his actions before this court (and any other court) if it were still in force, Hamad asks us to conclude that § 2241(e)(2) is no longer effective, either because it was struck down by *Boumediene* or because Congress would not have intended it to continue to have force once the Supreme Court invalidated § 2241(e)(1).

Hamad first argues that we should interpret *Boumediene* as invalidating § 2241(e) as a whole, not just § 2241(e)(1). Hamad notes that *Boumediene* did not expressly differentiate between § 2241(e)(1) and (2) when it concluded that § 2241(e) did not bar habeas petitions by Guantanamo detainees. Accordingly, Hamad argues, we should read *Boumediene* as striking down all of § 2241(e), not just the subsection dealing with habeas petitions, § 2241(e)(1).

---

1072–73. Congress subsequently repealed § 1005(e)(3) of the DTA, which had given the D.C. Circuit exclusive jurisdiction to review convictions by military tribunals. National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, 123 Stat. 2190, 2612.

We disagree. Although *Boumediene* did not expressly differentiate between § 2241(e)(1) and (2), the logic and context of the opinion make clear that the Supreme Court was addressing only § 2241(e)(1). Unlike statutes, judicial opinions "are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis." *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 433 (9th Cir. 2000). Rather, as we have long held, the "'language of the court must be read in the light of the facts before it.'" *Id.* (quoting *Julian Petroleum Corp. v. Courtney Petroleum Co.*, 22 F.2d 360, 362 (9th Cir. 1927)). As we have explained, *Boumediene* concluded that § 2241(e) deprived Guantanamo detainees of habeas corpus review and that this deprivation was unconstitutional in light of the Suspension Clause. That rationale for invalidating § 2241(e) applies exclusively to § 2241(e)(1), the statutory subsection that specifically addresses jurisdiction over habeas actions, and has no applicability to § 2241(e)(2), the statutory subsection that applies to actions other than habeas petitions. Indeed, the Supreme Court took pains to emphasize that it was invalidating § 2241(e) only to the extent that the statute barred the petitioners from filing habeas corpus actions: "[o]ur decision today holds only that petitioners before us are entitled to seek the writ; that the DTA review procedures are an inadequate substitute for habeas corpus; and that petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court." *Boumediene*, 553 U.S. at 795. Given the Court's focus on habeas petitions and the narrowness of its holding, it is plain that the Court was addressing only § 2241(e)(1). *See Kiyemba v. Obama*, 561 F.3d 509, 512 n.1 (D.C. Cir. 2009) ("The Court actually referred to § 7 without specifying a particular subsection of § 2241(e) but its discussion of the Suspension Clause clearly

indicates it was referring only to that part of § 7 codified at § 2241(e)(1).”). Accordingly, we conclude that *Boumediene* did not address § 2241(e)(2), let alone strike it down.

3

Second, Hamad contends that, even if *Boumediene* did not expressly invalidate § 2241(e)(2), we cannot sever that section from § 2241(e)(1), which the Court did invalidate. In essence, he argues that, in striking down § 2241(e)(1), the Court necessarily struck down § 2241(e)(2).

We also reject this argument. As a general rule, courts are to “refrain from invalidating more of [a] statute than is necessary,” *United States v. Booker*, 543 U.S. 220, 258 (2005) (internal quotation marks omitted), because “[a] ruling of unconstitutionality frustrates the intent of the elected representatives.” *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (alteration in original) (internal quotation marks omitted). Accordingly, when we invalidate an enactment because it is unconstitutional, we start with a presumption that the enactment is severable from the remainder of the section or act. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685–86 (1987). This presumption of severability is overcome only if something “in the statute’s text or historical context makes it ‘evident’ that Congress, faced with the limitations imposed by the Constitution, would have preferred” no statute at all to a statute with the invalid part excised. *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3162 (2010) (quoting *Alaska Airlines*, 480 U.S. at 684). In conducting this inquiry, “we must retain those portions of the Act that are (1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with Congress’ basic

objectives in enacting the statute." *Booker*, 543 U.S. at 258–59 (internal citations and quotation marks omitted). Congressional intent serves as the basis for this severability test. *Alaska Airlines*, 480 U.S. at 685.

Beginning with the second prong of the *Booker* severability test, it is apparent that § 2241(e)(2) is capable of functioning independently of § 2241(e)(1). In enacting § 2241(e), Congress dealt separately with two different categories of actions that could be brought by Guantanamo detainees: § 2241(e)(1) addressed habeas petitions, while § 2241(e)(2) addressed "any other action." *Boumediene*'s conclusion that § 2241(e)(1) violates the Suspension Clause does not prevent § 2241(e)(2) from functioning independently to bar non-habeas actions directed at an alien's detention or treatment.

Hamad contends that *Boumediene*'s interpretation of § 7(a) and (b) of the MCA shows that § 2241(e)(2) cannot function independently from § 2241(e)(1). As explained above, § 7(a) amends § 2241(e)(1) and (2), while § 7(b) provides that these amendments "apply to all cases . . . pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States."**[8]** MCA § 7(b). The *Boumediene* petitioners argued that § 7(b) applied only to the non-habeas actions described in § 2241(e)(2) because of the textual similarity between these two statutory provisions. *Compare* MCA § 7(b) (providing that the amendments to § 2241(e) apply to "all cases" relating "to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien

---

**[8]** The text of § 7 of the MCA is set forth *supra* at note 6.

detained by the United States"), *with* 28 U.S.C. § 2241(e)(2) (barring "any other action . . . relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien" detained as an enemy combatant). The Court rejected this argument, reasoning that the phrase "any *other* action" in § 2241(e)(2) must be read by reference to § 2241(e)(1), which discusses habeas actions. *Boumediene*, 553 U.S. at 737 (emphasis added). Read in context, the Court concluded, habeas actions in § 2241(e)(1) are a subset of the broader set of actions "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien." *Id.* at 737–38. Accordingly, *Boumediene* held that § 7(b)'s effective-date provision applied to habeas actions as well. *Id.* at 738–39.

Hamad seizes on the Court's statement that "any other action" in § 2241(e)(2) must be read by reference to § 2241(e)(1) as demonstrating that § 2241(e)(2) cannot function independently of § 2241(e)(1). We disagree. A subsection of a statute is capable of functioning independently as a "fully operative . . . law," *Alaska Airlines*, 480 U.S. at 684 (internal quotation marks omitted), even if it must be understood by reference to an inoperative portion of the statute in order for its meaning to be clear. *Booker* held, in striking down two sections of a statute as unconstitutional, that excised cross-references to these invalidated sections left the remaining sections valid and intact. 543 U.S. at 259. *Boumediene*'s invalidation of Congress's jurisdiction-stripping provisions with respect to the subset of habeas actions does not mean that the jurisdiction-stripping provisions applicable to the rest of the set are nonfunctional. Here, the reference in § 2241(e)(2) to § 2241(e)(1) merely makes clear the jurisdiction-stripping scope of § 2241(e)(2) as applying to all non-habeas actions. Section 2241(e)(2) is

fully operative because it bars jurisdiction over the subset of cases not covered by § 2241(e)(1).

We next turn to the third prong of the *Booker* severability test, which asks whether retaining § 2241(e)(2) is consistent with Congress's basic objectives in enacting the statute. *Booker*, 543 U.S. at 259. The structure of § 2241(e) indicates that Congress was motivated by two concerns. First, Congress sought to bar alien detainees from applying for habeas corpus, as reflected in § 2241(e)(1). But Congress did not stop there. In sweeping language, § 2241(e)(2) strips jurisdiction over "any" non-habeas action that relates to "any aspect" of enemy combatants' "detention, transfer, treatment, trial, or conditions of confinement." This broad language indicates that Congress was not concerned solely with habeas suits, but also sought to prevent alien detainees from bringing any other type of action that related to their detention or treatment. Considering that the two sections of § 2241(e) address two different types of lawsuits, we see no reason that Congress would not have enacted § 2241(e)(2)'s bar on non-habeas suits had it known that detainees could file for habeas.[9]

---

[9] In *Boumediene*, the Supreme Court held that the D.C. Circuit was "correct to take note of the legislative history when construing the [Military Commissions Act of 2006]." 553 U.S. at 738. Accordingly, we take note that the floor statements accompanying the enactment of the MCA confirm that one of Congress's goals in amending § 2241(e) was to limit the ability of enemy combatants to file non-habeas suits. For instance, in discussing the MCA's amendments to § 2241(e), Senator Cornyn noted that the purpose of § 2241(e)(2) was to prevent U.S. troops from being sued by detainees or former detainees. *See* 152 Cong. Rec. S10,403 (daily ed. Sept. 28, 2006) (statement of Senator Cornyn) ("Another major improvement that the MCA makes to the DTA is that it tightens the bar on nonhabeas lawsuits contained in 28 U.S.C. § 2241(e)(2). . . . We do not want those who were properly detained as

Moreover, the history of Congress's responses to Supreme Court decisions, as set forth above, further supports the conclusion that preserving § 2241(e)(2) is consistent with Congress's basic objective in enacting the MCA, which was to limit detainees' access to the courts. After the Supreme Court held that federal courts had statutory jurisdiction to hear Guantanamo detainees' habeas petitions, *Rasul*, 542 U.S. at 484, Congress passed § 1005(e) of the DTA to strip the courts of jurisdiction to hear such petitions or any other claim, with the exception of certain narrow challenges that could be filed in the D.C. Circuit. When the Supreme Court responded in *Hamdan*, holding that the DTA did not apply to pending claims, Congress passed the MCA to ensure that the jurisdiction-stripping provisions would apply to all pending claims. *Cf. Bismullah v. Gates*, 551 F.3d 1068, 1073 (D.C. Cir. 2009). Clearly, Congress's consistent intent was to channel and narrowly limit detainees' lawsuits of all sorts.

---

enemy combatants to be able to sue the U.S. military."). Similarly, Senator Sessions noted that a goal of § 2241(e) was to prevent former detainees from filing lawsuits against military officers. *See id.* at S10,404 (daily ed. Sept. 28, 2006) (statement of Senator Sessions). Statements on the floor of the House also indicate that Congress intended to limit detainee lawsuits. *See, e.g.*, *id.* at H7944 (daily ed. Sept. 29, 2006) (statement of Rep. Sensenbrenner) ("[T]his bill makes it clear to the terrorists and their lawyers in America that America will not allow them to subvert our judicial process nor to disrupt the war on terror with unnecessary or frivolous lawsuits."); *id.* at H7938 (daily ed. Sept. 27, 2006) (statement of Rep. Hunter) ("The practical effect of this amendment will be to eliminate the hundreds of detainee lawsuits that are pending in courts throughout the country and to consolidate all detainee treatment cases in the D.C. Circuit."). Because the parties have not pointed to any contrary history, the legislative history supports the conclusion that Congress would want to preserve the jurisdictional bar on non-habeas actions.

Preserving the provisions of § 2241(e) that limit detainees'
legal actions other than habeas is consistent with this goal.

Finally, Hamad argues that the absence of a severability
clause indicates that Congress did not intend these provisions
to be severable, and thus holding otherwise would be
inconsistent with Congress's objectives.   But "[i]n the
absence of a severability clause . . . , Congress' silence is just
that—silence—and does not raise a presumption against
severability." *Alaska Airlines*, 480 U.S. at 686.[10]  The lack of
a severability clause carries no weight in our analysis because
the text and historical context of § 2241(e)(1) and (2) make
it evident that these two provisions are severable.

Because § 2241(e)(2) is capable of "functioning
independently," and is consistent with Congress's basic
objectives in enacting the MCA, we conclude that it is
severable from § 2241(e)(1), and remains in effect, provided
that it is constitutional.

4

We finally turn to Hamad's arguments that § 2241(e)(2),
even if valid, is unconstitutional as applied to him.

Hamad first argues that § 2241(e) is unconstitutional,
because it deprives him of a federal forum to seek a remedy
for violations of his constitutional rights.  He asserts that the
Supreme Court has never upheld such a statute, and that it has

---

[10] Hamad notes that Congress titled § 7 of the MCA as "Habeas Corpus
Matters."  It is well-established that the title of a statute "'cannot limit the
plain meaning of the text.'" *I.N.S. v. St. Cyr*, 533 U.S. 289, 308–09 (2001)
(quoting *Pa. Dep't. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998)).

always presumed that Congress did not intend to deprive plaintiffs of a federal forum.

Hamad is correct that the Supreme Court has avoided the question whether Congress may completely deny a plaintiff access to federal forum to seek a remedy for a violation of constitutional rights. *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 n.12 (1986) (avoiding "the serious constitutional question that would arise if [the Court] construed [a statute] to deny a judicial forum for constitutional claims" (internal quotation marks omitted)). But we can likewise avoid addressing this difficult issue, because Hamad seeks only money damages, and the Constitution does not require the availability of such a remedy, even where the plaintiff's claim is based on alleged violations of constitutional rights. *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012). The Supreme Court's *Bivens* cases make this clear. In *Wilkie v. Robbins*, the Court noted that a *Bivens* remedy "is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified." 551 U.S. 537, 550 (2007). Indeed, the Court has declined to recognize a *Bivens* remedy in a variety of contexts. *See, e.g.*, *Schweiker v. Chilicky*, 487 U.S. 412 (1988) (denial of Social Security benefits); *United States v. Stanley*, 483 U.S. 669 (1987) (injuries that arise out of military service); *Bush v. Lucas*, 462 U.S. 367 (1983) (First Amendment violations by federal employers). Similarly, we have concluded that aliens not lawfully in the United States may not sue federal agents for money damages for wrongful detention. *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2012). These cases underscore that money damages are not constitutionally required for every violation of constitutional rights. Accordingly, § 2241(e)(2) is not

unconstitutional as applied to Hamad's claims for money damages. *See Al-Zahrani*, 669 F.3d at 319–20.

Hamad next argues that § 2241(e) functions as an unconstitutional bill of attainder, asserting that it strips a "discrete class of individuals," namely alien detainees, of access to the courts. We disagree. "Three key features brand a bill of attainder: that the statute (1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial trial." *SeaRiver Maritime Fin. Holdings Inc. v. Mineta*, 309 F.3d 662, 668 (9th Cir. 2002). The Supreme Court has emphasized that a statute must show "unmistakable evidence of punitive intent" before it may be struck down as a bill of attainder. *Flemming v. Nestor*, 363 U.S. 603, 619 (1960). In determining whether a statute inflicts punishment, we look to whether the statute "'falls within the historical meaning of legislative punishment'" or does not "'further nonpunitive legislative purposes.'" *SeaRiver*, 309 F.3d at 673 (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 852 (1984)).

Applying these principles, we conclude that § 2241(e)(2) is not a bill of attainder because it does not inflict legislative punishment. Jurisdictional limitations, such as the limitations imposed by § 2241(e)(2), do not fall within the historical meaning of legislative punishment. *Nagac v. Derwinski*, 933 F.2d 990, 991 (Fed. Cir. 1991); *see also Scheerer v. U.S. Attorney. Gen.*, 513 F.3d 1244, 1253 n.9 (11th Cir. 2008). Rather, the concept of legislative punishment encompasses penalties such as "imprisonment, banishment, [ ] the punitive confiscation of property by the sovereign" and "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations." *Nixon v. Adm'r of Gen. Servs*, 433 U.S. 425, 474 (1977). As we

have explained, Congress enacted § 2241(e) to limit and channel federal court review of detention and military commission decisions, not to impose any particular punishment on military detainees. Because there is no evidence that Congress had a punitive intent in enacting § 2241(e), much less "unmistakable evidence of punitive intent," *SeaRiver*, 309 F.3d at 677 (internal quotation marks omitted), we reject Hamad's argument that § 2241(e)(2) constitutes a bill of attainder.

Finally, Hamad argues that § 2241(e) violates the equal protection component of the Due Process Clause of the Fifth Amendment.[11] Noting that § 2241(e) deprives alien enemy combatants of the ability to bring specified legal actions, while imposing no comparable legal disabilities on citizens, Hamad argues that this distinction "serves no compelling legislative purpose and would not survive strict scrutiny."

As an initial matter, the Supreme Court has not determined whether the Fifth Amendment's protections even apply to Hamad. Prior to *Boumediene*, the Supreme Court had "never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." *Boumediene*, 553 U.S. at 770. Although *Boumediene*

---

[11] The Equal Protection Clause of the Fourteenth Amendment states: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although the Fourteenth Amendment does not apply to the federal government, *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), equal protection principles apply to the federal government through the Due Process Clause of the Fifth Amendment, *see id.* at 500, which states: "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

ultimately concluded that the Suspension Clause applies to aliens detained at Guantanamo Bay, the Court expressly confined its holding to that constitutional provision alone. *See id.* at 795; *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) ("*Boumediene* disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.").

Assuming, without deciding, that the Fifth Amendment's protections apply to aliens detained outside the United States, the Due Process Clause does not render § 2241(e)(2) unconstitutional. Where the Fifth Amendment applies, "[t]he federal sovereign . . . must govern impartially" and is therefore generally subject to equal protection principles. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Here there is no dispute that § 2241(e)(2) makes a distinction between aliens and citizens. In order to determine whether this classification is constitutional, we must first determine the appropriate standard of judicial review.

Although the Supreme Court has noted the "substantial limitations upon the authority of the States in making classifications based upon alienage," *Toll v. Moreno*, 458 U.S. 1, 10 (1982), the federal government's interests with respect to aliens differ substantially from those of the states, and there are legitimate reasons for Congress to make classifications based on alienage, *Mathews v. Diaz*, 426 U.S. 67, 78–80 (1976). These reasons include Congress's broad authority to make such classifications under its plenary power to regulate immigration and naturalization, *see United States v. Lopez-Flores*, 63 F.3d 1468, 1473 (9th Cir. 1995), as well as its authority to address the United States' relations with foreign powers and other foreign policy concerns, *Mathews*,

426 U.S. at 81. Indeed, legislation with respect to aliens is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," and "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 81 n.17 (internal quotation marks omitted).

Accordingly, we review alienage classifications drawn by Congress under a rational basis test. *Aleman v. Glickman*, 217 F.3d 1191, 1197 (9th Cir. 2000); *Lopez-Flores*, 63 F.3d at 1473. "Only classifications that 'arbitrarily subject all resident aliens to different substantive rules from those applied to citizens' will fail to survive that scrutiny." *Lopez-Flores*, 63 F.3d at 1475 (quoting *Hampton*, 426 U.S. at 101); *accord United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000); *United States v. Lue*, 134 F.3d 79, 86–87 (2d. Cir. 1998). Under the rational basis test, we will uphold a federal statute that makes a classification on the basis of alienage if it is "rationally related to a legitimate government interest." *Montenegro*, 231 F.3d at 395 (internal quotation marks omitted). Applying this test in *Lopez-Flores*, we upheld the federal Hostage Taking Act, which criminalized certain conduct involving either a foreign perpetrator or foreign victim, but not conduct where both the perpetrator and victim were United States nationals. 63 F.3d at 1470–72. Rejecting appellants' argument that the statute violated equal protection principles by "impermissibly classifying offenders and victims on the basis of alienage," *id.* at 1470, we concluded that "[t]he alienage classifications contained in the Hostage Taking Act were clearly intended to serve Congress' legitimate foreign policy concerns," and thus easily survived scrutiny, *Id.* at 1475.

In this case, Congress's decision in § 2241(e)(2) to preclude only alien detainees captured as part of the war on terror from bringing damages actions easily passes rational basis review. Congress's decisions with respect to these detainees are at the core of Congress's authority with respect to "the conduct of foreign relations, the war power, and the maintenance of a republican form of government," and thus are entitled to the most deferential judicial review. *Diaz*, 426 U.S. at 81–82 & n.17 (internal quotation marks omitted). Moreover, Congress's decision to focus on alien detainees, rather than citizens, is neither arbitrary nor irrational; it is clearly intended "to serve Congress' legitimate foreign policy concerns," *Lopez-Flores*, 63 F.3d at 1475, by ensuring that members of the armed forces are not unduly chilled in conducting the war on terror by concerns about foreign nationals targeting them with damages claims.

C

Because we do not have subject-matter jurisdiction to consider any of Hamad's claims, we need not reach Hamad's other arguments on appeal.[12] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (when jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause" (internal quotation marks omitted)). We vacate the district court's orders in this case and remand with instructions to enter judgment dismissing Hamad's action for lack of

---

[12] For the same reason, we do not reach the government's arguments on cross-appeal.

subject-matter jurisdiction. *See Capitol Industries-EMI, Inc. v. Bennett*, 681 F.2d 1107, 1118 (9th Cir. 1982).

**VACATED AND REMANDED.**