**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2011

MAMMAR AMEUR,

Plaintiff - Appellant,

v.

ROBERT M. GATES, in his individual capacity; DONALD RUMSFELD, in his individual capacity; PAUL WOLFOWITZ, in his individual capacity; GORDON ENGLAND, in his individual capacity; JAMES M. MCGARRAH, in his individual capacity; RICHARD B. MYERS, in his individual capacity; PETER PACE, in his individual capacity; MICHAEL GLENN MULLEN, "Mike", in his individual capacity; JAMES T. HILL, in his individual capacity; BANTZ CRADDOCK, in his individual capacity; GEOFFREY D. MILLER, in his individual capacity; JAY HOOD, in his individual capacity; HARRY B. HARRIS, JR., in his individual capacity; MARK H. BUZBY, in his individual capacity; ADOLPH MCQUEEN, in his individual capacity; NELSON CANNON, in his individual capacity; MICHAEL BUMGARNER, in his individual capacity; WADE DENNIS, in his individual capacity; BRUCE VARGO, in his individual capacity; ESTEBAN RODRIGUEZ, in his individual capacity; DANIEL MCNEILL, in his individual capacity; GREGORY J. IHDE, in his individual capacity; JOHN DOES 1-100, in their individual capacities; UNITED STATES OF AMERICA,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:12-cv-00823-GBL-TRJ)

Argued: May 13, 2014               Decided: July 16, 2014

Before TRAXLER, Chief Judge, and MOTZ and AGEE, Circuit Judges.

---

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Motz joined.

---

**ARGUED:** Gwynne Lynette Skinner, WILLAMETTE UNIVERSITY COLLEGE OF LAW, Salem, Oregon, for Appellant.  Sydney Foster, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:** Stuart F. Delery, Assistant Attorney General, Matthew M. Collette, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees.

---

AGEE, Circuit Judge:

In 2003, United States military personnel detained suspected terrorist Mammar Ameur at a military base in Afghanistan and, later, at a facility in Guantanamo Bay, Cuba. Although Ameur was determined to be an "enemy combatant," he was eventually released to his native country of Algeria in 2008.

After being released, Ameur brought suit in district court against former Secretary of Defense Robert Gates and other federal officials allegedly involved in his detention. Ameur's complaint requested monetary damages under the Alien Tort Claims Act, 28 U.S.C. § 1350, the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb–bb-4, and the United States Constitution. Applying a provision of the Military Commissions Act of 2006 ("MCA"), 28 U.S.C. § 2241(e)(2), the district court dismissed the complaint for lack of subject matter jurisdiction.

On appeal, Ameur contends that the district court erred in relying on an MCA provision that he argues the Supreme Court invalidated in Boumediene v. Bush, 553 U.S. 723 (2008). Additionally, he maintains that the relevant MCA provision was unconstitutionally applied in his case, even if Boumediene did not explicitly invalidate the MCA statute.

For the reasons discussed below, we affirm the district court's decision.

3

I.

A.

Ameur's complaint alleges that he was first detained in 2002 by Pakistani authorities.[1] Later, Ameur was transferred to American military custody at Bagram Airfield in Afghanistan. In March 2003, he was moved to detention facilities at the U.S. Naval Base in Guantanamo Bay, Cuba.

Ameur alleges that he suffered mistreatment and abuse during each of his various detentions and transfers. At Bagram, for instance, Ameur was purportedly beaten, attacked by dogs, subjected to harsh lights and music, interrogated, placed into stress positions, and deprived of religious materials. Similarly harsh abuse allegedly continued at Guantanamo until his release.

In 2004, during his detention at Guantanamo, a Combatant Status Review Tribunal ("CSRT") determined that Ameur was an "enemy combatant."[2] As an "enemy combatant," Ameur was found to

---

[1] Because the district court disposed of Ameur's complaint at the motion-to-dismiss stage, we "accept[] all well-pled facts as true and construe[] these facts in the light most favorable to the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

[2] CSRTs are "executive-branch tribunals convened to determine the status of Guantanamo detainees." Janko v. Gates, 741 F.3d 136, 138 (D.C. Cir. 2014); see also Al-Nashiri v. MacDonald, 741 F.3d 1002, 1004–05 (9th Cir. 2013) (discussing Department of Defense orders establishing CSRTs).

4

have been a "part of or supporting Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners." Bismullah v. Gates, 514 F.3d 1291, 1297 n.8 (D.C. Cir. 2008) (quoting Department of Defense regulations). Although Ameur alleges that the CSRT's decision was unsupported, his designation as an enemy combatant remains unchanged.

In August 2005, an Administrative Review Board ("ARB") recommended that Ameur was eligible for discretionary release,[3] but did not reverse Ameur's enemy-combatant designation. Rather, the ARB determination was premised "on an assessment of various factors, including the continued threat posed by each detainee." Janko, 741 F.3d at 138 n.2 (quotation marks omitted). Ameur was eventually released and transferred to his native Algeria in 2008.

B.

Three years after his release, in 2011, Ameur filed a complaint in the U.S. District Court for the Western District of

_____

[3] The executive branch created ARBs "to assess annually the need to continue to detain each enemy combatant during the course of the current and ongoing hostilities." Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 279 n.1 (2d Cir. 2009). This process permits each enemy combatant at Guantanamo "to explain why he is no longer a threat to the United States and its allies in the ongoing armed conflict against Al Qaida and its affiliates and supporters or to explain why his release would otherwise be appropriate." Id.

5

Washington. His complaint contained claims against Gates, 21 other current and former Department of Defense officials, and 100 unnamed "John Doe" federal officials in their individual capacities. The Washington district court first dismissed all of Ameur's claims -- except those claims against Gates -- for lack of personal jurisdiction. Then, finding that many of the decisions described in Ameur's complaint were made at the Pentagon, the district court transferred the case to the Eastern District of Virginia.

Once the case was transferred, Ameur filed an amended complaint. This amended complaint reasserted claims against all the original defendants, contending that they performed, endorsed, commanded, or supported various unlawful acts during Ameur's detention. Ameur alleged that these acts violated customary international law, the Geneva Conventions, the First and Fifth Amendments, and the Religious Freedom Restoration Act. The complaint sought compensatory and punitive monetary damages.

Invoking the Westfall Act, 28 U.S.C. § 2679, the United States substituted itself for all defendants as to Ameur's claims under the Alien Tort Claims Act. The Government certified that the defendants were federal employees acting within the scope of their employment when they performed the acts alleged in Ameur's complaint. See 28 U.S.C. § 2679(d).

The United States and the individual defendants then filed a motion to dismiss, which the district court granted. See Ameur v. Gates, 950 F. Supp. 2d 905, 913 (E.D. Va. 2013). The district court determined that 28 U.S.C. § 2241(e)(2) deprived it of subject matter jurisdiction, as Ameur was detained as an enemy combatant and his claims concerned his treatment in detention. Id. at 910-13; see also 28 U.S.C. § 2241(e)(2) (barring non-habeas-corpus actions brought by certain detainees challenging the conditions of their detention). Furthermore, the district court held that sovereign immunity barred Ameur's international-law claims, as the United States had properly substituted itself as a defendant to those claims.[4]

Ameur timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

II.

This appeal considers the effect of one portion of the MCA codified at 28 U.S.C. § 2241(e). Section 2241(e) provides:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly

---

[4] In a footnote, the district court also noted that Ameur had failed to plead that he had administratively exhausted his international-law claims, providing an additional reason to dismiss them.

7

detained as an enemy combatant or is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

In Boumediene, the Supreme Court struck down § 2241(e)(1) as an unconstitutional suspension of the writ of habeas corpus. But § 2241(e)(2), which bars plaintiffs like Ameur from bringing "any other action," does not implicate habeas corpus.

If § 2241(e)(2) applies to Ameur's claims, then courts lack subject matter jurisdiction to hear them. See, e.g., Aamer v. Obama, 742 F.3d 1023, 1028–29 (D.C. Cir. 2014); Al-Nashiri, 741 F.3d at 1006–07. When a district court dismisses for lack of subject matter jurisdiction, as in the case before us, "we review the district court's factual findings with respect to jurisdiction for clear error and the legal conclusion that flows therefrom de novo." In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 333 (4th Cir. 2014) (quotation marks and alteration omitted). We must decide this jurisdictional issue before any others. See Steel Co. v. Citizens for a Better Env't, 523 U.S.

8

83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause." (quotation marks omitted)).

Section 2241(e)(2)'s plain terms bar Ameur's suit, and he does not argue to the contrary. Ameur's action is one "other" than habeas corpus, which is discussed in the preceding subsection, § 2241(e)(1). It is against "agents" of the United States, in that all the defendants were government personnel at the time of the relevant events. See Hamad v. Gates, 732 F.3d 990, 990–91, 995 (9th Cir. 2013) (finding that detainee's suit against same defendants was "against the United States or its agents"). The complaint relates only to Ameur's "detention, transfer, treatment, trial, or conditions of confinement" during his "detention by the United States." And a CSRT panel has determined that Ameur was an "enemy combatant." See Janko, 741 F.3d at 144 (holding that a CSRT determination is a determination by the United States under § 2241(e)(2)); Hamad, 732 F.3d at 995 (same). Finally, Ameur does not bring his suit under the identified provisions of the Detainee Treatment Act ("DTA"), which formerly permitted suits seeking review of certain CSRT determinations and military commission decisions in the U.S. Court of Appeals for the D.C. Circuit. See DTA, Pub. L. No. 109–148, § 1005(e)(2)–(3), 119 Stat. 2680, 2741–42 (2005).

Conceding that his claims come within the plain terms of § 2241(e)(2), Ameur instead argues that the jurisdiction-stripping provision is invalid. He posits two independent grounds for his position: (1) the Supreme Court has expressly invalidated § 2241(e)(2); or (2) even if the statute has not been directly rejected, it is nevertheless non-severable from § 2241(e)(1), which has been expressly declared unconstitutional. We address these arguments in turn.

III.

Initially, Ameur contends that the Supreme Court expressly struck down § 2241(e)(2) in Boumediene. We disagree.

In Boumediene, the Supreme Court addressed an entirely separate part of the MCA -- § 2241(e)(1), which solely concerns habeas corpus. The Court first observed that § 2241(e)(1) stripped courts of jurisdiction to hear habeas actions brought by aliens held at Guantanamo. 553 U.S. at 736–38. Then, after surveying the history of the writ, the Court determined that habeas corpus did extend to aliens held at Guantanamo. Because Guantanamo detainees were entitled to habeas review, the Supreme Court concluded that § 2241(e)(1)'s denial of that right implicated Article I, section 9 of the Constitution -- often termed the Suspension Clause. Id. at 771; see also U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus

10

shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). The Court further concluded that aliens held at Guantanamo were not afforded any adequate substitute for habeas corpus, 553 U.S. at 792, and, lacking that substitute, "§ 7 of the [MCA], 28 U.S.C. § 2241(e), operate[d] as an unconstitutional suspension of the writ." Id. at 733.

Despite its unrestricted reference to § 2241(e) in that one sentence, the Supreme Court's sole focus in Boumediene was the effect of the Suspension Clause on § 2241(e)(1), as the only matter before the Court was an application for a writ of habeas corpus. But § 2241(e)(2) -- the section we are concerned with here -- relates strictly to actions "other" than habeas. For that reason, Boumediene did not address the validity of § 2241(e)(2). And because § 2241(e)(2) does not limit, discuss, relate to, or otherwise touch upon the writ, it could not be said to "suspend" it. Therefore, § 2241(e)(2) lacks any nexus to the rationale adopted by the Supreme Court in Boumediene. See Aamer, 742 F.3d at 1030 ("[S]ection 2241(e)(2) has no effect on habeas jurisdiction, and thus the Suspension Clause is not relevant and does not affect the constitutionality of the statute." (quotation marks omitted)); see also, e.g., Swain v. Pressley, 430 U.S. 372, 380-82 (1977) (explaining that the

11

Suspension Clause is violated only where habeas corpus is rendered "inadequate or ineffective").

Even so, Ameur seizes on some of the Court's broader language -- for instance, the quotation recited above referencing the entire MCA Section 7 -- and insists that the Court invalidated more than just the habeas-related provision of § 2241(e)(1).[5] Two of our sister circuits have already rejected this formalistic argument. We must do so as well. See Hamad, 732 F.3d at 1000 ("[T]he logic and context of the opinion make clear that the Supreme Court was addressing only § 2241(e)(1)."); Al-Zahrani v. Rodriguez, 669 F.3d 315, 319 (D.C. Cir. 2012) ("[T]he Supreme Court's decision in Boumediene [struck] the bar to federal court jurisdiction over habeas claims, but . . . the reasoning of the Supreme Court applied only to the stripping of habeas jurisdiction.").

_____

[5] Ameur also says that the Supreme Court in Boumediene expressly "rejected the argument that [§§] 2241(e)(1) and (e)(2) could be read apart or treated separately." (Appellant's Opening Br. 16.) Ameur misreads Boumediene. As the Government notes, Boumediene suggested that the two subsections of § 2241(e) had to be read together for purposes of an effective-date provision. See 553 U.S. at 737. The Court did not anywhere intimate that the provisions were to be read together in any other instance or for any other purpose. As the district court explained, the Court's discussion of the effective-date provision does not apply here because this case does not relate to the effective-date provision. See Ameur, 950 F. Supp. 2d at 913.

12

Ameur's broadest-possible-reading approach is inconsistent with the analysis that we undertake in applying Supreme Court opinions. "[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Ark. Game & Fish Comm'n v. United States, 133 S. Ct. 511, 520 (2012) (quotation marks omitted); see also Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944) ("[W]ords of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court."). Boumediene arose solely in the habeas corpus context, not in a case involving a basic claim for damages -- that is, a case like the one before us. Boumediene relied on law exclusive to habeas corpus and therefore should be applied only to the habeas-corpus context in which it arose.

In sum, the Supreme Court in Boumediene did not address, let alone invalidate, § 2241(e)(2). "[T]o the extent that the Supreme Court in Boumediene . . . permitted further judicial examination of the detention of enemy combatants, it did so using the limited tool of the constitutionally guaranteed writ of habeas corpus -- not an implied and open-ended civil damages action." Lebron v. Rumsfeld, 670 F.3d 540, 555 (4th Cir. 2012).

13

IV.

In the alternative, Ameur argues that <u>Boumediene</u> invalidated § 2241(e)(2) by implication in striking down § 2241(e)(1).  He contends that §§ 2241(e)(1) and (e)(2) are non-severable, even though § 2241(e)(2) is a separate provision.  In other words, Ameur posits that the separate subsections found in Section 7 of the MCA -- §§ 2241(e)(1) and (e)(2) -- must rise and fall together.

<u>Boumediene</u> did not address severability; it had no reason to.  Nonetheless, Ameur maintains that "the absence of any severability analysis in <u>Boumediene</u> supports the conclusion that the Court did not believe that the two subsections of § 2241(e) were severable."  (Appellant's Opening Br. 18.)  He cites no authority -- and we have found none -- supporting that kind of adverse inference.  In fact, "[c]ourts routinely reserve judgment on severability, especially when, as in <u>Boumediene</u>, no party briefed the issue or raised it at oral argument."  <u>Basardh v. Gates</u>, 545 F.3d 1068, 1072 (D.C. Cir. 2008).  As Justice Thomas has explained, even the Supreme Court "often disposes of as-applied challenges to a statute . . . without saying anything at all about severability."  <u>United States v. Booker</u>, 543 U.S. 220, 322 (2005) (Thomas, J., dissenting).  "Such decisions (in which the Court is silent as to applications not before it) might be viewed as having conducted an implicit severability

14

analysis.  A better view is that the parties in those cases could have raised the issue of severability, but did not bother, because (as is often the case) there was no arguable reason to defeat the presumption of severability."  Id. (citation omitted).

And indeed, Ameur's argument faces a high hurdle in view of the presumption of severability.  "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem."  Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 328 (2006); accord Pittston Co. v. United States, 368 F.3d 385, 400 (4th Cir. 2004) (recognizing the "background presumption that when an application of a statute is determined to be unconstitutional, courts seek to preserve as much of the statute as is still consistent with legislative intent").  "Because the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the 'normal rule' is that partial . . . invalidation is the required course."  Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 130 S. Ct. 3138, 3161 (2010) (quotation marks, alteration, and citation omitted).

Applying the presumption of severability, we will find one statutory provision to be severable from another unless we encounter one of three limited circumstances.  First, we must strike any provisions that are not themselves constitutionally

15

valid.  See Booker, 543 U.S. at 258.  Second, we must invalidate a provision if it is incapable of "functioning independently." Id.  And third, we cannot uphold a provision if its separate existence would be inconsistent with "Congress' basic objectives in enacting the statute."  Id. at 259.

Ameur suggests that all three of these limited circumstances exist here.  We find that none of the arguments that Ameur proffers has merit.

## A. Constitutional Validity

Ameur raises four distinct challenges to § 2241(e)(2)'s constitutionality.  First, he suggests that the statute unconstitutionally deprives him of access to courts.  Second, he maintains that § 2241(e)(2) unconstitutionally directs the rules of decision in a case.  Third, he argues that § 2241(e)(2)'s focus on alien detainees violates equal protection principles. And fourth, he says that the section amounts to an unconstitutional bill of attainder.  All of these arguments fail.

### 1.

Ameur first argues that Congress deprived him in § 2241(e)(2) of any forum for his purported constitutional violations, violating both separation-of-powers principles and due process.  To be sure, the Supreme Court has noted that "serious constitutional questions" may arise if a person is left

16

without a forum for adjudicating his constitutional claims. See, e.g., Calcano-Martinez v. INS, 533 U.S. 348, 351 (2001).

To resolve this case, however, we need not decide whether Congress can entirely foreclose constitutional claims, as Ameur asks only for monetary damages. "[T]he Constitution does not require the availability of such a remedy, even where the plaintiff's claim is based on alleged violations of constitutional rights." Hamad, 732 F.3d at 1003; accord Al-Zahrani, 669 F.3d at 319-20; Davis v. District of Columbia, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[T]he Constitution does not mandate a damages remedy for all injuries suffered as a result of a constitutional violation."). In other words, money damages are "not an automatic entitlement" anytime that constitutional rights have been violated. Wilkie v. Robbins, 551 U.S. 537, 550 (2007); accord Zehner v. Trigg, 133 F.3d 459, 462 (7th Cir. 1997) ("[T]he Constitution does not demand an individually effective remedy for every constitutional violation.").

Indeed, the Supreme Court has refused to imply a monetary remedy for constitutional violations in many cases. See Minneci v. Pollard, 132 S. Ct. 617, 622 (2012) (collecting cases and noting that "the Court has had to decide in several different instances whether to imply a Bivens action[,] [a]nd in each instance it has decided against the existence of such an action"); see also, e.g., Lebron, 670 F.3d at 555-56 (refusing

17

to recognize implied damages remedy for claimed constitutional violations at Guantanamo). For instance, the Supreme Court has refused to recognize Bivens claims where Congress created an alternative remedial scheme to resolve those claims, see, e.g., Schweiker v. Chilicky, 487 U.S. 412, 424-28 (1988), or where "special factors" -- such as concerns over interfering in military affairs -- counsel against recognizing a new form of liability, see, e.g., United States v. Stanley, 483 U.S. 669, 681 (1987). Given Congress' clear intent to divert detainee treatment claims from federal court and into military tribunals, and given the obvious national security concerns such claims implicate, we have already concluded that constitutional claims brought by Guantanamo detainees are not cognizable under Bivens. See Lebron, 670 F.3d at 555-56 ("Congress rather than the courts should decide whether a constitutional claim should be recognized in these circumstances.").[6] As courts may decline to recognize an implied cause of action for money damages in these

---

[6] At oral argument, counsel for Ameur noted that the complaint also sought "such further relief as the Court may deem just and proper." (J.A. 67.) She suggested that this vague boilerplate phrase might provide a basis to find that Ameur sought more than monetary damages. Nonetheless, counsel conceded that the crux of the complaint was monetary relief and was unable to define any additional relief that might be available. We agree with the Government, then, that this suit is a suit for monetary damages. Moreover, Ameur failed to present this argument in the district court or in his briefs in this Court, so "we hold that it was waived." W. Va. CWP Fund v. Stacy, 671 F.3d 378, 389 (4th Cir. 2011).

18

circumstances, then surely Congress may explicitly deprive courts of jurisdiction to entertain those very same cases.

"[W]hen Congress can validly extinguish a right to one or more judicial remedies, it can also take away judicial jurisdiction over suits in which plaintiffs seek remedies that Congress has permissibly precluded." Richard H. Fallon, Jr., Jurisdiction-Stripping Reconsidered, 96 Va. L. Rev. 1043, 1104 (2010). After all, "the right of access to federal courts is not a free-floating right, but rather is subject to Congress' Article III power to set limits on federal jurisdiction." Roller v. Gunn, 107 F.3d 227, 231 (4th Cir. 1997).

Ameur suggests that we find a constitutional entitlement to damages in these circumstances because former detainees may not look to other remedies such as a writ of habeas corpus or an injunction. According to Ameur, money damages afford his only conceivable means of remedying the constitutional violations he suffered. By depriving courts of jurisdiction to hear money damages claims, Ameur argues, Congress has altogether prevented him from vindicating his constitutional rights.

But the Supreme Court has held that courts may be deprived of jurisdiction to hear damages claims even in cases where money damages provide the plaintiff's only means of recovery. In Stanley, for example, the Court declined to recognize a damages remedy even though the plaintiff's only possible remedy was

19

money damages, as "congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." 483 U.S. at 683. "It is irrelevant," the Court explained, "whether the laws currently on the books afford Stanley, or any other particular serviceman, an 'adequate' federal remedy for his injuries." Id. The Court's readiness to withhold a money damages remedy in Stanley -- even where it was "damages or nothing," id. at 690 (Brennan, J., dissenting) -- demonstrates that Congress may similarly withhold a damages remedy here. We may not assume that a constitutionally mandated remedy exists for Ameur merely because he cannot locate a remedy elsewhere. See also Bush v. Lucas, 462 U.S. 367, 388 (1983) (stating that the question of whether to imply a monetary remedy for a constitutional violation "obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff").

Section 2241(e)(2) thus does not violate separation-of-power principles or due process by denying Ameur access to courts.

2.

Section 2241(e)(2) also does not reflect an unconstitutional attempt on Congress' part "to direct the substantive outcome of litigation." (Appellant's Opening Br. 26.) Ameur premises this argument on United States v. Klein, 80

20

U.S. (13 Wall.) 128, 146 (1871), in which the Supreme Court warned that Congress could not "prescribe rules of decision . . . in cases pending before [the Court]." We have narrowly read Klein to hold only that "Congress violates the separation of powers when it presumes to dictate how the Court should decide an issue of fact (under threat of loss of jurisdiction) and purports to bind the Court to decide a case in accordance with a rule of law independently unconstitutional on other grounds." United States v. Brainer, 691 F.2d 691, 695 (4th Cir. 1982) (quotation marks omitted). Section 2241(e)(2) does not speak to any issue of fact or bind the Court to an independently unconstitutional rule. More obviously, Klein speaks to pending cases, and this case was not pending when Congress enacted § 2241(e)(2). See Miller v. French, 530 U.S. 327, 349 (2000) (characterizing Klein's holding as limited to pending cases). Thus, for many reasons, Klein does not apply here.

3.

Ameur next raises an equal protection challenge to § 2241(e)(2), noting that it applies only to aliens. In the equal-protection context, a "challenged classification need only be rationally related to a legitimate state interest unless it violates a fundamental right or is drawn upon a suspect classification such as race, religion, or gender." Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir. 2008).

21

Rational-basis review -- not strict scrutiny, as Ameur argues -- is the correct standard to apply here.  See, e.g., Hamad, 732 F.3d at 1005-06 (assessing § 2241(e)(2)'s constitutionality under rational-basis test).  Aliens detained as enemy combatants enjoy no fundamental right to a money damages remedy.  Nor is the alienage classification found in § 2241(e)(2) a suspect classification.  When Congress classifies based on alienage, courts give that choice leeway.  See, e.g., Korab v. Fink, 748 F.3d 875, 882 (9th Cir. 2014) ("Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions . . . between citizens and aliens."); United States v. Huitron-Guizar, 678 F.3d 1164, 1170 (10th Cir. 2012) ("[C]ourts must defer to Congress as it lawfully exercises its constitutional power to distinguish between citizens and non-citizens."); cf. Mathews v. Diaz, 426 U.S. 67, 79-80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").  Thus, "[C]ongressional classifications based on alienage are subject to rational basis review."  United States v. Ferreira, 275 F.3d 1020, 1025 (11th Cir. 2001) (emphasis omitted); accord City of Chicago v. Shalala, 189 F.3d 598, 605 (7th Cir. 1999).

Section 2241(e)(2) survives rational-basis review, a "deferential" standard that asks only whether Congress had a "reasonable basis for adopting the classification." Wilkins, 734 F.3d at 348. That "reasonable basis" is evident for § 2241(e)(2), as the statute is meant to limit court interference in our nation's war on terror. See Hamad, 732 F.3d at 1006 (explaining that provision was meant to "ensur[e] that members of the armed forces are not unduly chilled in conducting the war on terror by concerns about foreign nationals targeting them with damages claims"); see also Mathews, 426 U.S. at 81 n.17 (describing how matters like "foreign relations, the war power, and the maintenance of a republican form of government" "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference" (quotation marks omitted)).

In other contexts, courts have approved of Congress' use of citizenship as a proxy for situations likely to involve foreign terrorism, which in turn trigger special concerns relating to foreign affairs and immigration. See, e.g., United States v. Lue, 134 F.3d 79, 87 (2d Cir. 1998) ("Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to warrant a federal criminal proscription."). The same principle applies

23

here: Congress could rationally conclude that litigation involving non-citizen combatants poses a special risk of raising foreign relations, immigration, or military-related matters that courts are usually not equipped to address. Therefore, Congress appropriately confined those issues to other proceedings more closely tied to the political branches, while affording broader relief to citizens (who do not present foreign relations issues).

In addition, the decisions that Congress made here are consistent with the long-standing differential treatment of enemy aliens during times of war, see, e.g., Johnson v. Eisentrager, 339 U.S. 763, 769–77 (1950), and reflect a rational Congressional attempt to deal with the threat of overburdened courts in a piecemeal fashion, Helton v. Hunt, 330 F.3d 242, 246 (4th Cir. 2003) (explaining that legislatures are free to act "one step at a time, addressing . . . the phase of the problem which seems most acute to the legislative mind" (quotation marks omitted)).

Ameur has not attempted to address any of these genuine interests. Instead, he focuses on whether the classification was narrowly tailored. "[U]nder rational basis review, however, the classification need not be the most narrowly tailored means available to achieve the desired end." Zehner, 133 F.3d 459 at

24

463. Accordingly, Ameur's equal protection argument lacks merit.

4.

Lastly, § 2241(e)(2) is not a bill of attainder. "A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding." Lynn v. West, 134 F.3d 582, 594 n.11 (4th Cir. 1998); see also United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997) ("A Bill of Attainder is a legislative determination of guilt which metes out punishment to named individuals."). Courts apply three general tests to determine whether a statutory provision qualifies as a prohibited bill of attainder: (1) a "historical" test that looks to traditional forms of legislative punishment, (2) a "functional" test that looks to the purposes served by the bill, and (3) a "motivational" test that looks to actual legislative motives. See, e.g., ACORN v. United States, 618 F.3d 125, 136 (2d Cir. 2010); accord Citizens for Equal Prot. v. Bruning, 455 F.3d 859, 869 (8th Cir. 2006). "[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute [on the ground that it is a bill of attainder]." Communist Party of the U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 82–83 (1961).

Section 2241(e)(2) is not a bill of attainder under any of these tests.

Ameur posits that precluding persons from appearing in courts amounts to a historic form of punishment, but does not point to any case involving a channeling provision that precludes particular types of claims from being brought. Such jurisdictional limits are usually not viewed as a traditional "punishment." See Hamad, 732 F.3d at 1004 ("Jurisdictional limitations . . . do not fall within the historical meaning of legislative punishment."); Scheerer v. U.S. Att'y Gen., 513 F.3d 1244, 1253 n.9 (11th Cir. 2008) (declining to find that "jurisdictional rule" amounted to bill of attainder); Nagac v. Derwinksi, 933 F.2d 990, 990-91 (Fed. Cir. 1991) (same).

As to the functional test, a statute passes that standard when it "reasonably can be said to further nonpunitive legislative purposes." Nixon v. Admin. of Gen. Servs., 433 U.S. 425, 475-76 (1977). As we have already explained, § 2241(e)(2) serves several legitimate ends: it channels military-related matters into military courts, keeps federal courts out of complicated foreign affairs questions, and limits the burdens that could flow from an unlimited right of litigation for detainees.

And Section 2241(2) passes muster under the motivational test. Ameur points to nothing in the legislative history

26

indicating a punitive purpose. Though he contends that the statute was passed with the intent to "reverse the holdings of the Supreme Court" (Appellant's Opening Br. 30), these types of legislative overrides are unobjectionable so long as they stay within constitutional bounds -- and such congressional changes happen often. See, e.g., Rivers v. Roadway Exp., Inc., 511 U.S. 298, 305 n.5 (1994) ("Congress frequently 'responds' to judicial decisions construing statutes, and does so for a variety of reasons."). More to the point, statements of mere disagreement with previous Supreme Court decisions do not establish "punitive" intent toward an individual or group. And, in any event, these kinds of statements would be insufficient evidence on their own. See Selective Serv. Sys. v. Minn. Pub. Interest Research Grp., 468 U.S. 841, 855 n.15 (1984) (explaining that "isolated" statements from legislators "do not constitute the unmistakable evidence of punitive intent" required (quotation mark omitted)).

Finally, we observe that § 2241(e)(2) does not meet the "naming" or "specificity" requirement for bills of attainder. "A statute with open-ended applicability, i.e., one that attaches not to specified organizations but to described activities in which an organization may or may not engage, does not single out a particular person or group for punishment." Hettinga v. United States, 677 F.3d 471, 477 (D.C. Cir. 2012)

27

(quotation marks omitted). The statute at issue here attaches to past and future conduct, not status (or some proxy for status, like past conduct alone). After all, the statute is triggered by unlawful combat against the United States. See Ex parte Quirin, 317 U.S. 1, 30-31 (1942) (explaining the difference between lawful and unlawful combatants). This open-ended classification makes us even more certain that § 2241(e)(2) is not a bill of attainder.

* * *

Section 2241(e)(2) is constitutional. Therefore, it satisfies the first prong of the severance standard.

## B. Independent Function

Ameur next suggests that § 2241(e)(2) cannot function independently because it cross-references other statutes that may not be currently valid. But he never explains why a mere cross-reference renders the whole section ineffective. And, indeed, a reference-by-reference analysis reveals no reason to doubt § 2241(e)(2)'s independent vitality as a stand-alone statute.

For instance, it does not matter that § 2241(e)(2) refers in its first clause to the DTA. True, the two referenced DTA provisions are no longer operative: Congress repealed one paragraph and the D.C. Circuit -- the only circuit entitled to hear DTA claims -- nullified the other. See Bismullah, 551 F.3d

28

at 1075 (finding that <u>Boumediene</u> invalidated DTA section 1005(e)(2) because Congress would not have intended DTA review to supplement an existent habeas remedy); National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, 123 Stat. 2190, 2612 (repealing DTA section 1005(e)(3)). But those changes only have the effect of mooting the "except" language in § 2241(e)(2)'s introductory clause, not § 2241(e)(2) in its entirety. Put differently, changes in the DTA have simplified § 2241(e)(2): courts no longer need ask whether a suit that falls within the ambit of § 2241(e)(2) might instead be brought under the DTA.

The "other action" language -- which must be read as the converse of § 2241(e)(1)'s habeas language -- also does not defeat § 2241(e)(2)'s independence. "A subsection of a statute is capable of functioning independently as a fully operative law, even if it must be understood by reference to an inoperative portion of the statute in order for its meaning to be clear." <u>Hamad</u>, 732 F.3d at 1001-02 (quotation marks, citation, and alteration omitted). The cross-reference to § 2241(e)(1) serves merely a definitional purpose and does not negate § 2241(e)(2) by association. <u>See, e.g.</u>, <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 142 (1996) (finding that one section's cross-reference to earlier, invalid section did not establish "such

29

'interdependence' that [the later section] becomes 'purposeless' when [the earlier section] is unenforceable").

Finally, it does not matter that the Government now uses the designation "unprivileged enemy belligerent" for persons similarly situated to Ameur, rather than denominating them as "enemy combatants." 10 U.S.C. § 948a. Ameur acknowledges his designation as an "enemy combatant," and § 2241(e)(2) is triggered by that designation. Section 2241(e)(2) functions as an independent statute and meets the second prong of the severability test.

### C. Congressional Objective

Independence aside, Ameur also argues that allowing § 2241(e)(2) to stand alone would be inconsistent with Congress' basic objectives in enacting the MCA. Again, we disagree. "Congress's overriding goal" in passing the MCA "was to limit the judicial review available to detainees." Bismullah, 551 F.3d at 1073; see also H.R. Rep. No. 109-664, pt. 1, at 27 (2007) (congressional committee indicating that it wished to "make clear" that detainee review was limited to two narrow contexts); cf. Lebron, 670 F.3d at 554-55 (detailing Congress' efforts to constrain judicial review in areas of national security concern). "Congress designed the direct review regime to limit judicial intervention and to consolidate review in one forum." Basardh, 545 F.3d at 1071. Therefore, we doubt that

30

Congress would prefer to open the floodgates to all sorts of detainee-related litigation merely because <u>Boumediene</u> required courts to allow one narrow sub-class of cases under the Suspension Clause, a provision that does not even apply here.

Ameur's contention that legislative history supports his view is also without merit. To declare a provision non-severable, legislative history must make it "evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." <u>Pittston Co.</u>, 368 F.3d at 400 (quotation marks omitted). Here, Ameur cites just one instance where Congress removed a severability clause from the MCA and another when Congress refused to adopt one. As the Government notes, both instances involved amendments in the nature of a substitution. <u>See</u> 152 Cong. Rec. 19,928, 19,948 (2006) (passing amendment without severability clause); <u>id.</u> at 19,970 (rejecting amendment with severability clause). We cannot say that Congress was focused on a minor provision (that is, the severability clause) while making wholesale changes to the broader statutory scheme. More importantly, "congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." <u>United States v. Craft</u>, 535 U.S. 274, 287 (2002) (quotation

marks and alteration omitted); see also Red Lion Broad. Co. v. FCC, 395 U.S. 367, 382 n.11 (1969) ("[U]nsuccessful attempts at legislation are not the best guides to legislative intent."); Tenneco Inc. v. Pub. Serv. Comm'n of W. Va., 489 F.2d 334, 338 (4th Cir. 1973) (refusing to draw an adverse inference from Congress' refusal to enact particular legislative provision).

Lastly, Ameur's argument invites us to draw conclusions from the absence of a severability clause. But "the ultimate determination of severability will rarely turn on the presence or absence of such a clause." United States v. Jackson, 390 U.S. 570, 585 n.27 (1968). "Congress' silence is just that -- silence -- and does not raise a presumption against severability." Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987).

Section 2241(e)(2) is a severable statute from § 2241(e)(1). We reject all of Ameur's arguments to the contrary.

V.

The parties raise several additional points, which we find unnecessary to address in light of our conclusion that the district court lacked jurisdiction over the complaint under the MCA. See, e.g., Golden & Zimmerman, LLC v. Domenech, 599 F.3d 426, 433 n.2 (4th Cir. 2010) ("Because we have concluded that

32

the district court was correct in finding that it did not have subject matter jurisdiction . . ., we need not address [these] alternative argument[s]."). "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining . . . is that of announcing the fact and dismissing the cause." Steel Co., 523 U.S. at 94.

## VI.

For these reasons, the decision of the district court dismissing Ameur's complaint for lack of subject matter jurisdiction is

AFFIRMED.